John CAFFERTY, Jr., Individually and d/b/a John Cafferty Music and p/k/a John Cafferty and The Beaver Brown Band, Plaintiff,

v.

SCOTTI BROTHERS RECORDS, INC., et al., Defendants.

No. 93 CIV. 5914(DC).

United States District Court, S.D. New York.

June 27, 1997.

Frankel & Abrams, for Plaintiff; by Sandor Frankel, Stuart E. Abrams, Al J. Daniel, Jr., New York City.

Shatzkin & Reiss, for Defendants Scotti Brothers Records, Inc., Scotti Brothers Industries, Inc., and Famous Music Corporation; by Karen Shatzkin, New York City.

Parcher, Hayes & Liebman, P.C., for Defendant BMG Music; by Steven M. Hayes, New York City.

## OPINION

CHIN, District Judge.

In 1983, the movie "Eddie and the Cruisers" was released. It told the story of a fictitious struggling rock and roll band. The songs performed by the band in the movie were dubbed by a real-life band, John Cafferty and the Beaver Brown Band. Cafferty also wrote most of the songs and scoring music for the film. A soundtrack album was produced and released.

The record company that produced the soundtrack album signed Cafferty and the Beaver Brown Band to a contract for the creation of records in their own name. Two such albums were released. In real life, however, the fictitious band fared better than the real one. Sales of the Eddie and the Cruisers soundtrack soared, while sales of the Cafferty and Beaver Brown Band albums met with limited success. A second soundtrack album based on a sequel to "Eddie and the Cruisers" was also released.

The record company failed to pay certain royalties to Cafferty. In addition, in an effort to recoup its investments and to capitalize on the success of Eddie and the Cruisers, the record company released previously unreleased Cafferty music and re-released Caf-

ferty's two albums—packaged and marketed as the music of Eddie and the Cruisers. Unfortunately, however, they did so without Cafferty's complete consent.

In this case, Cafferty sues the companies involved in the making and distribution of the movies and albums in question for copyright infringement, false advertising, unfair competition, breach of contract, breach of fiduciary duty, and other violations of state law. Before the Court are the cross-motions of defendants and plaintiff for partial summary judgment.

For the reasons that follow, defendants' motions are granted in part and denied in part and plaintiff's cross-motion is granted in part and denied in part.

### Statement of the Case

#### A. The Facts

Cafferty is a professional recording artist, musician, and songwriter. He has been performing and recording his own as well as other compositions with his band, "John Cafferty and the Beaver Brown Band" (the "Band"), since 1972.

In the early 1980's, Cafferty and the Band performed a number of songs as well as scoring music for the soundtrack to "Eddie and the Cruisers" ("Cruiser I"), a movie about a rock and roll band called "Eddie and the Cruisers." The band's leader, Eddie, was played by the actor Michael Pare. Cafferty's songs, as performed by the Band, were dubbed into the movie as the musical performances of the fictitious Cruisers band.

Cafferty provided the music pursuant to a contract dated August 31, 1982, subsequently amended, entered into with the predecessor to defendant Aurora Film Partners ("Aurora"), a film production company (the "Cafferty–Aurora Contract") (DX 3). Two of the songs in the movie ("Wild Summer Nights" and "Tender Years") had previously been written by Cafferty. The other songs and music were written by Cafferty specifically for the movie.

Aurora entered into an agreement with a record company, Scotti,[1] dated June 5, 1983, subsequently amended, whereby Scotti was given a license to produce and manufacture an album based on the soundtrack for Cruisers I (the "Scotti–Aurora Contract") (DX 4). The soundtrack album was released in 1983 (the "Cruisers I Album"), initially with moderate success. After Cruisers I aired on cable television in 1984, however, sales of the Cruisers I Album took off, as more than two million copies were eventually sold domestically.

After the release of the Cruisers I Album, Cafferty entered into a recording contract with Scotti dated October 17, 1983 (the "Cafferty–Scotti Recording Contract") (DX 5), pursuant to which Cafferty and the Band were to create and perform songs under their own names. Records produced under the Cafferty–Scotti Recording Contract were not intended to have any connection to Eddie and the Cruisers or any Cruisers movie or album. Two albums were released under this agreement: "Tough All Over" in 1985 and "Roadhouse" in 1989. These albums, however, did not sell well.

In 1985, Scotti produced a soundtrack album based on the movie "Rocky IV." That album featured a song written by Cafferty and performed by the Band: "Heart's on Fire." In 1986, Scotti released a soundtrack album based on the movie "Cobra." That album also featured a Cafferty song, "Voice of America's Sons," which was originally composed for and recorded on the "Tough All Over" album.

In 1989, a sequel to the Cruisers I movie was released, entitled "Eddie and the Cruisers II—Eddie Lives!" ("Cruisers II"). Pursuant to an agreement between Cafferty and Scotti dated January 31, 1989 (the "Cruisers II Contract") (DX 6), Cafferty wrote and the Band performed the soundtrack for Cruisers II. Scotti eventually released an album, entitled "Eddie and the Cruisers II—Eddie

---

1. "Scotti" refers to defendants Scotti Brothers Records, Inc. ("Scotti Records") and Scotti Brothers Industries, Inc. ("Scotti Industries") collectively. Scotti Industries is apparently now known as All–American Television Productions, Inc. Although certain of the actions herein were taken by Scotti Records and some were taken by Scotti Industries, for purposes of this motion I will treat them as one entity.

Lives!" (the "Cruisers II Album"), based on the soundtrack for Cruisers II. Scotti advanced some $600,000 to Cafferty for the project. Although the Cruisers II Album sold better than Cafferty's two albums, it did not sell as well as the parties had expected.

In 1991, Scotti produced and released an album entitled "Eddie and the Cruisers—the Unreleased Tapes" (the "Unreleased Tapes Album"). The Unreleased Tapes Album featured Cafferty's music and songs (including outtakes, scoring cues, and demo recordings). Scotti had not, however, obtained Cafferty's approval prior to its release. The cover of the album states, in small print: "Original Songs Written And Performed By JOHN CAFFERTY And THE BEAVER BROWN BAND." (PX 6).

In 1992, Scotti produced and released an album entitled "Eddie and the Cruisers— Live and in Concert" (the "Cruisers Live Album"). Again, although the Cruisers Live Album features Cafferty's music and performances, Scotti did not obtain his approval prior to producing and releasing it. While the music had been performed (live) by Cafferty and the Band in their own names, the Cruisers Live Album was packaged and sold as the music of Eddie and the Cruisers. Indeed, Cafferty's name is nowhere mentioned on the cover of the album. (PX 7).

In 1992, Scotti and Cafferty entered into 21 "Mechanical License" agreements, covering each of Cafferty's 21 copyrighted songs appearing on the Cruisers I, Cruisers II, and Unreleased Tapes Albums. (DX 12, 14, 15). Cafferty signed mechanical licenses for his songs on the Unreleased Tapes Album even though he had not been consulted prior to the album's release. Cafferty was also asked to sign mechanical licenses for his songs on the Cruisers Live Album, but he refused.

In April 1993, Scotti produced and released an album entitled "The Voice of Eddie and the Cruisers—'tough all over' " (the "Eddie Tough All Over Album"). The Eddie Tough All Over Album was a re-release of Cafferty's 1985 Tough All Over album, which had not been connected in any way to Eddie and the Cruisers. Cafferty and the Band are listed on the cover, which features a likeness of the actor who played the Eddie character.

In August 1993, Scotti produced and released an album entitled "The Voice of Eddie and the Cruisers—Roadhouse" (the "Eddie Roadhouse Album"). The Eddie Roadhouse Album was a re-release of Cafferty's 1989 Roadhouse album, which had not been connected in any way to Eddie and the Cruisers. Cafferty and the Band are listed on the album cover, which features a likeness of the actor who played the Eddie character.

Cafferty was entitled to two types of royalties: "mechanical" royalties for the use of his songs on sound recordings, and "artist" royalties for the use of his performances on sound recordings. It is undisputed that Scotti failed to account for and pay royalties to Cafferty for a number of years. Indeed, Scotti concedes that it failed to pay Cafferty both mechanical and artist royalties.

By letter dated October 15, 1992 (DX 16), counsel for Cafferty wrote to Scotti confirming termination of the Cafferty–Scotti Recording Contract, as Scotti and Cafferty had agreed that they would not be making any new records together. The letter also referred to Scotti's failure to pay certain royalties and demanded royalty statements and payments. Some six weeks later, when Scotti still had not submitted statements or payments, Cafferty's counsel sent another letter to Scotti, dated December 3, 1992 (DX 17), purporting to terminate the mechanical licenses pursuant to paragraph 2(d) thereof. The letter stated:

> [Y]ou are hereby advised that all of the Licenses have automatically terminated, and all recordings made and/or distributed embodying the aforementioned compositions constitute infringement of my client's copyrights in the compositions pursuant to the United States Copyright Act.

Notwithstanding this notice, Scotti continued to market and distribute the albums in question.

## B. *Prior Proceedings*

The complaint in this case was filed on August 24, 1993. It sets forth 19 claims. Named as defendants are Scotti; Aurora and its affiliated company, Aurora Productions, Inc.; Aurora's predecessor, Eddie and the

Cruisers Productions, Inc.; Famous Music Corporation ("Famous"), which purchased certain assets, including the rights to certain Eddie and the Cruisers compositions, from Scotti in 1992; and BMG Music ("BMG"), sued herein as Bertelsmann Music Group, Inc., which entered into a distribution contract with Scotti in 1990.

Claims I, II, III, and IV of the complaint allege copyright infringement based on the Cruisers I Album, the Cruisers II Album, the Unreleased Tapes Album, and the Cruisers Live Album, respectively. Claims V and VI assert false designation or unfair competition claims under the Lanham Act. Claims VII, VIII, and X allege deceptive acts and practices and false advertising claims under the New York State General Business Law. Claim IX charges certain defendants with engaging in the common law tort of unfair competition. Claims XI through XVII allege breach of contract claims. Claim XVIII is a breach of fiduciary duty claim. Finally, Claim XIX alleges violations of Cafferty's rights of privacy and publicity under sections 50 and 51 of the New York State Civil Rights Law.

After the parties conducted discovery, defendants Scotti and Famous moved for partial summary judgment dismissing most of Cafferty's claims. BMG also moved for summary judgment relying on Scotti's papers. Cafferty cross-moved for partial summary judgment, seeking summary judgment in his favor on liability with respect to all 19 claims.

### DISCUSSION

The nineteen claims fall into five categories: (a) copyright infringement (Claims I–IV), (b) unfair competition (Claims V–X), (c) breach of contract (Claims XI–XVII), (d) breach of fiduciary duty (Claim XVIII), and (e) the Civil Rights Law (Claim XIX). I will discuss each category in turn.

### A. *The Copyright Claims*

#### 1. *Claim I*

Claim I is based on Cafferty's original two songs, "Wild Summer Nights" and "Tender Years," reproduced on the Cruisers I Album. Scotti was initially given a license to use the songs, but when Scotti admittedly failed to provide royalty statements and pay royalties, Cafferty sought to invoke paragraph 2(d) of the mechanical licenses. Paragraph 2(d) provides:

In the event you fail to account to us and pay royalties as herein provided for, we or our representatives may give written notice to you that, unless the default is remedied within thirty (30) days from the date of the notice, this compulsory license will be automatically terminated. Such termination shall render the making or the distribution, or both, of all phonorecords for which royalties have not been paid, actionable as acts of infringement under, and fully subject to the remedies provided by, the Copyright Act....

(DX 12). Because defendants continued to distribute the Cruisers I Album after the purported termination of Scotti's rights, Cafferty contends, they violated his copyrights.

Cafferty's arguments are rejected, for they ignore the clear language of the relevant contracts. In the Cafferty–Aurora Contract, Cafferty "irrevocably" granted to Aurora and its "licensees" and "assignees" "the universe-wide, perpetual right, without any additional fee of any kind, to synchronize, record, perform and otherwise exploit the Pre-existing Songs...." (DX 3, 3). In the Scotti–Aurora Contract, Aurora granted an exclusive license to Scotti to manufacture, distribute, and sell records from the soundtrack. (DX 4, §§ 3.01, 11.01(d)). Hence, as the exclusive licensee, Scotti stands in Aurora's shoes in this respect and cannot be sued for infringement. *United States Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692, 695 (2d Cir.1991).

Cafferty's reliance on paragraph 2(d) of the mechanical licenses is misplaced. Paragraph 2(c) specifically provided that "this compulsory license does not supersede nor in any away [sic] affect any prior agreements now in effect respecting phonorecords of said copyrighted work." Two such "prior agreements," of course, were the Cafferty–Aurora Contract and the Scotti–Aurora Contract. The Cafferty–Aurora Contract clearly contemplated that mechanical licenses would be issued, as it provided:

If any of the Pre-existing songs is incorporated in the soundtrack album of the Photoplay, Cafferty or his publishing designee shall issue a mechanical license for such soundtrack album and the singles related thereto ...

(DX 3, at § 3(a)). Hence, the mechanical licenses were clearly related to, and thus pursuant to paragraph 2(c) could not supersede, the two prior agreements. Claim I is dismissed.

### 2. *Claim II*

■ Claim II is based on Scotti's continued distribution of the Cruisers II Album, which contains ten of Cafferty's songs, after the purported termination of the mechanical licenses. Again, however, the prior agreements preclude this claim.

The Cruisers II Contract provided that:

Any musical compositions written by John Cafferty Jr., in whole or in part, will be jointly and equally owned by Cafferty and Scotti Brothers or its designee.... Each party shall have the right to administer their respective shares of such compositions.

(DX 6, at § 3). Hence, Scotti was a co-owner and cannot be sued for infringement. *See Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him; nor can a joint owner of a copyright sue his co-owner for infringement.").

As with Claim I, Cafferty's reliance here on paragraph 2(d) of the mechanical licenses fails because the Cruisers II Contract is a "prior agreement[ ]" that cannot be superseded. Accordingly, Claim II is dismissed.

### 3. *Claim III*

Claim III is based on 13 songs appearing on the Unreleased Tapes Album. All 13 of the songs, however, come from the Cruisers I and Cruisers II movies. Hence, for the reasons set forth above with respect to Claims I and II, Claim III must be dismissed as well.

■ In addition, to the extent Claim III is premised on the fact that the Unreleased Tapes Album was released without Cafferty's prior approval or consent, the claim must be dismissed on estoppel, waiver, or ratification grounds because it is undisputed that Cafferty signed mechanical licenses for the songs in question in mid–1992, *after* he learned that the album was being released. Even assuming there were copyright violations at that point, Cafferty took no steps to seek relief. To the contrary, he executed mechanical licenses with respect to the songs in question.[2] Accordingly, Claim III is dismissed.

### 4. *Claim IV*

Although defendants have not moved for summary judgment to dismiss Claim IV, it must be discussed in the context of Cafferty's cross-motion for summary judgment. Claim IV is based on defendants' release of the Cruisers Live Album, which contained ten of Cafferty's copyrighted songs. Because he did not authorize the release of this album or the use of his songs on the album, Cafferty contends that his copyrights were violated. Indeed, Cafferty argues that because Scotti released the Cruisers Live Album even after he refused to sign the mechanical licenses proffered to him by Scotti, the infringement was willful.

In response to the motion, Scotti argues that an issue of fact exists as to whether, because of administrative difficulties, it knew that the mechanical licenses for the Cruisers Live Album were never signed. In addition, Scotti contends that a factual dispute exists as to whether the recordings in question come from a video soundtrack of a concert given by the Band at the Ritz Club in New York City. If so, as Scotti contends, it had the right to market those songs under the Cafferty–Scotti Contract because the video was filmed as part of the marketing of the Tough All Over Album. *See* DX 5, §§ 7.01 ("All Master Recordings made under this

---

2. In contrast, Cafferty refused, at the same time he returned the Unreleased Tapes Album mechanical licenses, to return the Cruisers Live Album mechanical licenses because he was "to- tally opposed to the whole concept of the Eddie and the Cruisers Live record." (Cafferty Dep. at 188).

agreement or during this term . . . ., and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of [Scotti], free from any claims by you or any other Person (except for obligation to make payments to you hereunder) . . . ."), 7.02 ("[Scotti] and any Person authorized by [Scottie] shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made under this agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing, throughout the world.").

Scotti's first argument is rejected. No genuine issue of fact exists as to whether Scotti reasonably believed that the mechanical licenses in question had been signed before the Cruisers Live Album was released. The undisputed facts show that the Cruisers Live Album was released in May 1992, before any of the mechanical licenses were signed and returned by Cafferty. He returned the signed 21 mechanical licenses on June 15, 1992; the Cruisers Live Album licenses were not included. (DX 14). There simply is no factual support for the proposition that, to the extent it needed it, Scotti had Cafferty's permission to use his copyrighted songs on the Cruisers Live Album or that it believed it had his permission.

The record is not clear, however, as to the source of the sound recordings used on the Cruisers Live Album. Cafferty acknowledges that some of the songs (but not the recordings) came from the Cruisers I Album and that some of the recordings were of live performances of the Band at the Ritz in New York. He contends, however, that some of the songs were from a live concert given in Florida in March 1986, as to which Scotti can make no claim of ownership. In reply, Scotti submitted evidence contradicting Cafferty's statement that some of the recordings were from the Florida concert.

■ I find that a factual issue exists with respect to Claim IV, but only as to the sources of the songs and recordings. If any

of the songs on the Cruisers Live Album came from the Florida concert and are songs as to which Scotti has no ownership interest, then Scotti willfully infringed Cafferty's copyrights in those songs by releasing the Cruisers Live Album without his consent. To the extent Claim IV is based on songs from the Cruisers I Album or from the Ritz concert, however, it is dismissed.

## B. *The Unfair Competition Claims*

Claims V through X assert various unfair competition claims relating to the release of the Unreleased Tapes, Cruisers Live, Eddie Tough All Over, and Eddie Roadhouse Albums.

### 1. *The Unreleased Tapes Album*

■ The claims based on the Unreleased Tapes Album must be dismissed. As discussed above, Cafferty signed mechanical licenses for the songs in question *after* he learned that the album was being released, and apparently *after* he had been provided with a copy. (Cafferty Dep. at 79–81, 84; DX 41). Not only did he not object to release of the album, he ratified the entire process by executing mechanical licenses with respect to the songs in question. Hence, he cannot be heard to complain about the Unreleased Tapes Album now.

### 2. *The Other "Repackaged" Cruisers Albums*

■ The claims based on the Cruisers Live, Eddie Tough All Over, and Eddie Roadhouse Albums, however, are a different matter. These three albums were packaged and marketed to appear as if they contained the music of Eddie and the Cruisers. Scotti argues that because Eddie and the Cruisers was a fictitious band, the public—and particularly those fans most likely to buy these albums, *i.e.*, those who saw the movies—could not have been misled into believing that the music on the albums was actually the music of the fictitious band. Moreover, Scotti points out that on the covers of both the Eddie Tough All Over and Eddie Roadhouse Albums the name "John Cafferty and the Beaver Brown Band" is prominently dis-

played and the liner notes to the Eddie Live Album prominently disclose that the songs were written by Cafferty and performed by "John Cafferty and the Beaver Brown Band."

Scotti's arguments are rejected, for questions of fact exist as to whether the public was or will be misled. Although unlikely, it may be that some purchasers of the albums actually believed that a band entitled Eddie and the Cruisers existed. More likely, some fans might have been led into believing that the albums featured music actually related to the Cruisers I and Cruisers II movies. Certainly, some fans might not have realized that they were purchasing non-original or recycled music, music that had been released years earlier that was being re-released and re-packaged as something that it was not— music connected to the movies.

Moreover, Cafferty surely has standing to complain. In essence, he found himself competing against himself. At the same time that he was continuing to try to establish himself as a songwriter and performing artist in his own right, his songs and recordings that had nothing to do with Eddie and the Cruisers were being sold as the music of Eddie and the Cruisers.

Scotti argues that Cafferty cannot recover damages without proof of actual confusion on the part of consumers, and points to the purported absence in the record of any evidence of actual confusion. While Scott's statement of the law is correct as a general proposition, a plaintiff in a Lanham Act case may prove actual confusion indirectly, i.e., by proving intentional deception. *George Basch Co. v. Blue Coral Inc.*, 968 F.2d 1532, 1537 (2d Cir.1992). In addition, a plaintiff need only prove likelihood of confusion to obtain equitable relief. *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981). Genuine issues of fact exist as to the existence and likelihood of actual confusion and whether defendants intended to deceive the public. Accordingly, the cross-motions for summary judgment with respect to the unfair competition claims are denied.

### C. The Breach of Contract Claims

Claims XI through XVII assert breach of contract claims based on apparently 59 different alleged breaches, as identified in plaintiff's interrogatory responses and designated in the motion papers as claims 1 through 59. (DX 35). The parties' cross-motions raise six issues: (1) royalties on "free goods"; (2) statute of limitations; (3) Cafferty's entitlement to an "accounting"; (4) claims based on the Unreleased Tapes Album; (5) interest; and (6) rescission.[3]

#### 1. Free Goods

Claims 7, 8, 18, 19, 28, 39, 42, 48, and 52 allege that Scotti failed to account to Cafferty for certain records and goods that Scotti and BMG gave away free to their customers for promotional purposes. These claims must be dismissed because the underlying contracts clearly do not obligate Scotti to pay royalties on such "free goods."

Section 9.01 of the Scotti–Cafferty Contract refers to royalties on albums "sold," and Section 10.03 states explicitly that no royalties shall be payable on records distributed for promotional purposes. (DX 5). The Cafferty–Aurora Contract and the Scotti–Aurora Contract also only refer to the payment of royalties for albums "sold." (DX 3, § 6; DX 4 § 7.01).

Cafferty's argument that he is entitled to royalties on free goods because the mechanical license agreements provide for the payment of royalties on all albums "made and distributed" suffers from the same infirmity as his claims for copyright infringement—Section 2(c) of the license agreements explicitly subordinates the mechanical license agreements to the prior agreements between the parties.

Cafferty also argues that the limitations in the Cafferty–Scotti contract and the Scotti–CBS distribution agreement on the number of goods the defendants can distribute without paying royalties creates an obli-

3. Scotti also moved to dismiss claim 27. (Def.Mem. at 28–29). In his motion papers, Caf- ferty withdrew this claim. (Pl.Mem. at 37 n. 18).

gation to pay royalties on *all* goods given away free. (Pl.Mem. at 31–32). But a contractual limitation on the number of records that can be given away free would support an action for royalties for goods given away free in excess of the contractual limitation, not an action for royalties on *all* free goods. *Cf. Record Club of America v. United Artists Records, Inc.,* 1991 WL 73838 (S.D.N.Y.1991) (action to recover royalties on records given away free in excess of contractual limitation on such free goods).

None of the nine free goods claims alleges that Scotti exceeded the contractual limitations. Nor has Cafferty offered any evidence to support such a claim, stating only in his memorandum of law that "there is a factual dispute as to whether defendants exceeded the contractual limitations." (Pl.Mem. at 32). Because "conclusory allegations unsupported by factual data will not create a triable issue of fact," *Childers v. High Society Magazine,* 557 F.Supp. 978, 985 (S.D.N.Y.1983) (quoting *Marks v. U.S. Dept. of Justice,* 578 F.2d 261, 263 (9th Cir.1978)), Scotti's motion for summary judgment on the free goods claims is granted. Consequently, I do not reach Scotti's contention that claims 8, 19, and 52 are also time barred under the contracts.

### 2. *Statute of Limitations*

Cafferty commenced this litigation on August 24, 1993. Scotti contends that breach of contract claims 3, 4, 51, 54, 56, 57, and 58 are time-barred both under the relevant contracts and the California four year statute of limitations to the extent that they arise out of acts or omissions prior to August 24, 1989. 2 Cal.Civ.Code § 343 (Deering 1988). Cafferty argues that New York's six year statute of limitations should apply and that his claims are therefore timely.

New York's borrowing statute, Section 202 of the Civil Practice Law and Rules ("CPLR") (McKinney 1990), provides that in the case of a cause of action accruing outside of New York, the shorter limitation period of either (a) New York or (b) the state in which the cause of action arose applies. Cafferty argues that the cause of action arose in Rhode Island, where Cafferty is a resident and where the defendants were obligated to

tender payments to him. Rhode Island's statute of limitations on contract claims is ten years. Gen.Laws of R.I. § 9–1–13 (1985). Therefore, Cafferty argues, under CPLR § 202, New York's six year statute of limitations should apply.

Scotti argues that the cause of action arose in California because the Cafferty–Scotti Contract provides that "the legal effect of this agreement shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California." (*See, e.g.,* DX 5 ¶ 18.08). Therefore, Scotti argues, California's three year statute of limitations must apply.

The question of where a cause of action accrues under CPLR § 202 is an unsettled one. *See Callazo v. American Airlines,* 919 F.Supp. 110, 113 (E.D.N.Y.1996) (invocation of CPLR § 202 "requires inquiry into an unstable area of the law regarding where a cause of action 'accrues' for purposes of the borrowing statute"); *Insurance Co. of North America v. ABB Power Generation,* 925 F.Supp. 1053, 1060 n. 8 (S.D.N.Y.1996) ("The Court notes that there long have been disputes about the proper determination of the place where a cause of action accrues [under CPLR § 202]."). It is not clear whether, in addressing this question, a court should employ the "interest analysis" test, which applies the limitation period of the state with the greater interest in the dispute, or the traditional "place of injury" test, which applies the law of the state where the economic impact of the breach is felt.

In a 1978 case, the New York Court of Appeals stated that it was applying the "place of injury" test, but actually looked to the "jurisdiction that had the greater interest in the litigation." *Martin v. Julius Dierck Equip. Co.,* 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978). In a 1981 opinion addressing the issue, the Second Circuit held that a lower court's decision to take a conservative approach and apply the traditional "place of injury" test in light of the unclear state of the law was "sound as far as it went." *Stafford v. International Harvester,* 668 F.2d 142, 150 (2d Cir.1981). The Second

Circuit did not, however, explicitly endorse the "place of injury" test.

As a result, some district courts have applied the "interest analysis" test, while others have applied the "place of injury" test. *See Maslan v. American Airlines,* 885 F.Supp. 90, 93–94 (S.D.N.Y.1995) (summarizing cases applying one or the other test). In light of such confusion, the Maslan court held that a district court should apply *both* tests. *Id.* at 94. *See also Harrison v. Northwest Orient Airlines,* 677 F.Supp. 131, 133–34 (S.D.N.Y. 1987) (applying both tests).

While in *Maslan* both tests pointed to the same. conclusion, such an approach would not work here. A "place of injury" test would suggest that the law of Rhode Island, as the state of Cafferty's residence, should apply. *See Maslan,* 885 F.Supp. at 94 ("When the 'place-of-injury' test is applied to economic harm, the cause of action is said to accrue where the economic impact of the defendant's conduct is felt—usually the state of plaintiff's residence."). On the other hand, an interest analysis test would suggest that California law should apply given that the contracts were made in California and, other than serving as Cafferty's state of residence, Rhode Island has no relationship to the subject matter of the dispute.

 Nor does the choice of law provision in the contract provide any guidance. Under New York law, a choice of law clause is construed as choosing only the applicable substantive law, not the applicable limitation period. *Insurance Co. of North America,* 925 F.Supp. at 1059.

 Another approach suggested by the caselaw, and the one I will follow, is to "lean toward [the result] more likely to achieve [the] underlying policy of the borrowing statute." *Chartener v. Kice,* 270 F.Supp. 432 (S.D.N.Y.1967). *See also Stafford v. International Harvester,* 668 F.2d 142, 151 (2d Cir.1981) (CPLR § 202 should be interpreted "to effectuate the purpose which the statute was designed to serve"); *Insurance Co. of*

*North America,* 925 F.Supp. at 1060 ("[t]he borrowing statute is not applied without reference to its underlying purposes"). As "the main purpose of the borrowing statute is to prevent forum shopping by plaintiffs," *Stafford,* 668 F.2d at 152, I must attempt to reach that result most consistent with the goal of deterring forum shopping.

 Courts have held that application of CPLR § 202 is not necessary where the suit could not have been brought in a foreign forum with a shorter statute of limitations, for the obvious reason that in such a case, there is no danger that the plaintiff has brought suit in New York to take advantage of the longer statute of limitations. *See Stafford,* 668 F.2d at 152–53 (policy rationale of CPLR § 202 did not require application of shorter Pennsylvania statute of limitations where cause of action could not have been brought in Pennsylvania); *Insurance Co. of North America,* 925 F.Supp. at 1060 (application of borrowing statute to prevent forum shopping is not necessary where parties had contractually agreed not to bring suit in California).

Conversely, by the same rationale, if the plaintiff could have brought suit in another forum with a shorter statute of limitations, but chose instead to file in New York, application of the borrowing statute would deter forum shopping. In this case, nothing in the relevant contracts prevented plaintiff from filing in California, and California had far more significant contacts with the dispute than New York. Hence, California was the more likely forum for this litigation. Under these circumstances, allowing plaintiff to take advantage of the longer New York statute of limitations would reward forum shopping.[4] Therefore, consistent with *Stafford,* I hold that the California four year statute of limitations applies to plaintiff's breach of contract claims. Accordingly, claims 3, 4, 51, 54, 56, 57, and 58 are barred to the extent they relate to acts or omissions prior to August 24, 1989.

4. Cafferty might argue that he could have brought suit in Rhode Island and therefore his decision to file in New York is evidence that he is not forum shopping because the New York statute of limitations is shorter than the Rhode Is- land statute of limitations. I reject this argument. Cafferty's choice was clearly between New York and California and his choice of New York is consistent with forum shopping.

### 3. *Plaintiff's Right to an Accounting*

Scotti argues that breach of contract claims 7, 8, 9, 15, 18, 19, 28, 29, 39, 40, 42, 47, 48, 50, 52, and 53 should be dismissed because Cafferty is concededly unable to specify his damages on these claims without an audit or accounting. The Court has already dismissed claims 7, 8, 18, 19, 28, 39, 42, 48, and 52 on the grounds that defendants were not contractually obligated to account to plaintiff for goods given away free for promotional purposes. Therefore, this discussion relates only to claims 9, 15, 29, 40, 47, and 53.

 Scotti argues that these claims must be dismissed because plaintiff cannot prove his damages at trial with the degree of certainty required by 12 Cal.Civ.Code § 3301 (Deering 1988), which states, *inter alia,* that "no damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." As Judge Sweet explained with regard to the same California statute, also in the context of a dispute between a musical recording artist and a distribution company regarding the payment of royalties, only "the fact of damages ... must be proved with reasonable certainty," and "the amount of damages need not be calculated with reasonable certainty." *Gordy Co. v. Mary Jane Girls, Inc.,* 1989 WL 149290 at *23 (S.D.N.Y. Dec.6, 1989). In *Gordy,* Judge Sweet dismissed certain claims for lost profits on unproduced albums, unwritten songs and hypothetical sales that plaintiff claimed he was denied as a result of the distribution company's breach of contract. *Id.* at *24. In this case, Cafferty's claims are not for hypothetical lost profits, but for actual lost profits. Whether Cafferty is entitled to damages for these claims is a fact that can be determined with reasonable certainty. It is only the amount of the damages that requires a further accounting. Accordingly, § 3301 of the California Civil Code provides no basis for dismissing the claims and Scotti's motion for summary judgment as to these claims is denied.

Scotti has offered no legal authority for the argument that Cafferty is not entitled to an accounting because he could have sought such information in discovery. Moreover, an accounting to determine the amount of royalties due is an appropriate and recognized remedy in a case such as this. *See Nolan v. Sam Fox Publishing Co.,* 300 F.Supp. 1311, 1320 (S.D.N.Y.1969), *aff'd,* 499 F.2d 1394 (2d Cir.1974) (directing an accounting to determine amount of royalties due to musical composer in breach of contract action).

As to plaintiff's cross-motion for summary judgment in this respect, there is no dispute that royalties were not paid for a substantial period of time. On the present record, however, summary judgment in favor of Cafferty is not appropriate because I cannot determine what amounts are due and owing on the contract claims that survive defendants' motions. I will consider, and the parties should be prepared to discuss at the next pretrial conference, whether the contract claims for unpaid royalties should be severed from the rest of the case and addressed by way of an accounting.

### 4. *Unreleased Tapes*

 Scotti seeks summary judgment dismissing the breach of contract claims based on the Unreleased Tapes Album on grounds of waiver and estoppel. To the extent the claim is based on Scotti's failure to obtain prior approval from Cafferty, the claim is dismissed, for Cafferty ratified Scotti's release of the album. Scotti's motion is denied, however, to the extent the claim seeks payments due and owing, for Cafferty certainly did not waive his right to be paid royalties.

### 5. *Interest*

Scotti moves to dismiss claims 13, 25, 38, and 45 insofar as they seek additional interest on royalties due Cafferty that accrued after December 31, 1992, the date of Scotti's first tender of partial payment of past royalties, which was rejected by Cafferty.

On October 22, 1993, after litigation had commenced, Scotti sent Cafferty checks totalling $141,096.92 as payment for outstanding royalties. (DX 22). On July 13, 1994, Scotti sent Cafferty a check for $12,967.63 representing interest owed on the past due royalties. (DX 23). Scotti deliberately excluded from the July 13 payment interest

that accrued after December 31, 1992, the date on which Scotti first tendered partial payment of the outstanding royalties. (DX 18). As a result of the omission of interest for the period December 31, 1992 to October 23, 1993, Cafferty claims that he is still owed $4,778.02. Scotti argues that Cafferty's rejection of the December 31 tender relieves Scotti of its obligation to pay interest on outstanding royalties after the date of the attempted cure.

 "It is well settled that the tender of payment of a debt ... operates to terminate all incidents of the obligation, such as interest." *Litwak v. Wolkenberg*, 130 A.D.2d 630, 631, 515 N.Y.S.2d 559, 560 (2d Dep't 1987). To stop the accrual of interest, the amount of the tender must have been sufficient to satisfy the debt. 83 N.Y.Jur.2d, Payment and Tender, § 166 at 55–56 (1990). *See also Affiliated Credit Adjustors v. Carlucci & Legum*, 139 A.D.2d 611, 613, 527 N.Y.S.2d 426, 428 (2d Dep't 1988) ("a lawful bona fide tender of the amount due prevents the accrual of further interest"). In this case, the tender was clearly not sufficient to satisfy the amount of the debt and therefore Scotti's motion to dismiss plaintiff's claims for additional interest is denied.

### 6. *Rescission*

Cafferty contends that Scotti's failure to account to Cafferty and failure to pay royalties for a three year period are breaches that go "to the heart of its contractual relationship with Cafferty and are sufficient to justify rescission of the contracts and reversion to Cafferty of all rights in the recordings and compositions at issue." (Pl.Mem. at 29).

 The law is clear, however, that rescission is not an appropriate remedy in this case. Rescission of a contract is an "extraordinary remedy" that should be permitted only if the breach is "material and willful or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394, 1397 (2d Cir.1974). Applying these general principles, the Court of Appeals for the Second Circuit has held that, in the absence of fraud, a contract assigning rights in a musical composition cannot be rescinded for non-payment of royalties unless the failure to pay royalties is total. In *Nolan*, the assignee of a composer's copyright in a popular song failed to pay the composer 74% of the royalties due and, for a six year period, failed to pay any royalties on income from foreign sources, from licensing of the song for public performances, or from income from most printed materials. *Id.* at 1398. Nevertheless, the Court of Appeals held that because the defendant had made partial payment of the royalties due plaintiff, the contract could not be rescinded. *Id.* at 1399. *See also Gordy Co. v. Mary Jane Girls, Inc.*, 1989 WL 149290 at *41 (S.D.N.Y. Dec.6, 1989) (denying claim for rescission in suit by recording artist for past royalties due to absence of an allegation of fraud or complete non-payment). In this case, there is no dispute that, on October 22, 1993, Scotti made at least partial payment of the royalties due Cafferty and there is no allegation of fraud on Scotti's part.

Accordingly, Scotti's motion for summary judgment dismissing Cafferty's claims for rescission as a matter of law is granted.

### D. *The Breach of Fiduciary Duty Claim*

 Claim XVIII asserts a breach of fiduciary duty claim. This claim is dismissed, for Cafferty simply has not presented sufficient facts from which a jury could find the special circumstances necessary for the creation of a fiduciary relationship. As Judge Martin has held,

> In the absence of special circumstances, no fiduciary relationship exists between a music publisher and composers as a matter of law.

*Carter v. Goodman Group Music Publishers*, 848 F.Supp. 438, 445 (S.D.N.Y.1994); *accord Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1157 (S.D.N.Y.1988) ("the greater weight of authority ... teaches that the conventional publisher-author arrangement is not a per se fiduciary relationship"). The cases cited by Cafferty are not to the contrary.

 Cafferty's relationship with Scotti was a conventional one. Represented by

counsel, he entered into arms-length contracts with Scotti. Those contracts did not create a fiduciary relationship. Cafferty's remedy is to seek damages for breach of contract. Accordingly, Claim XVIII for breach of fiduciary duty is dismissed.

### E. *The Civil Rights Law Claims*

■ Claim XIX alleges violations of sections 50 and 51 of the New York State Civil Rights Law. Section 50 prohibits the use, for purposes of advertising or trade, of a living person's "name, portrait or picture" without his prior written consent. N.Y. Civil Rights Law § 50 (McKinney 1992). Section 51 permits an individual aggrieved by a violation of section 50 to sue for injunctive relief and damages. Section 51 also provides, however, that:

nothing contained in this article shall be so construed as to prevent any person, firm or corporation ... from using the name, portrait, picture or voice of any author, composer or artist in connection with his literary, musical or artistic productions which he has sold or disposed of with such name, portrait or picture used in connection therewith.

N.Y. Civil Rights Law § 51 (McKinney Supp. 1997). This exclusion applies to the sale or disposition of compositions, and contemplates that the sale or disposition of a composition carries with it the right to use—accurately— the composer's name or likeness in connection with the composition. *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 69, 77 (S.D.N.Y.1982).

■ Here, with one exception, genuine issues of fact exist with respect to the scope of Cafferty's consent, whether defendants' actions exceeded that consent, and whether defendants fairly and accurately used Cafferty's name in connection with compositions the rights to which were transferred to defendants. The one exception are the claims based on the Unreleased Tapes Album. For the reasons stated above, Cafferty ratified Scotti's release of the Unreleased Tapes Album and thus he has waived any claims under Sections 50 and 51 in that respect. Accordingly, the cross-motions for summary judgment as to the privacy claim are denied, except as to the Unreleased Tapes Album.

### CONCLUSION

The cross-motions for partial summary judgment are granted in part and denied in part. The motions of defendants Famous and BMG are granted and denied to the same extent as the motion of defendant Scotti. To summarize:

**a) Copyright Claims (Claims I through IV)**

Claims I, II, and III, seeking damages for copyright infringement, are dismissed. Claim IV is dismissed to the extent that it is based on songs from the Cruisers I album or the Ritz concert. At trial, Scotti may not argue that it had or reasonably believed it had Cafferty's permission to use his copyrighted songs on the Cruisers Live album.

**b) Unfair Competition (Claims V through X)**

The unfair competition claims are dismissed insofar as they are based on the Unreleased Tapes album. To the extent they are based on the other "repackaged" Cruisers albums, however, the unfair competition claims raise triable issues of fact as to whether the public was or will be misled.

**c) Breach of Contract Claims (Claims XI through XVII)**

The breach of contract claims relating to free goods are dismissed, as are those claims alleging breaches that took place more than four years before the initiation of the lawsuit in August, 1993. Likewise, Cafferty's claims for rescission are dismissed. The rest of Cafferty's breach of contract claims raise triable issues of fact, at least as to the amounts due and owing.

**d) Breach of Fiduciary Duty Claim (Claim XVIII)**

The breach of fiduciary duty claim is dismissed.

**e) Civil Rights Law Claim (Claim XIX)**

Claim XIX raises triable issues of fact, except insofar as it is based on the Unreleased Tapes album. Claim XIX is dismissed only to the extent it is based on the Unreleased Tapes album.

A pretrial conference will be held in Courtroom 11A of the United States Courthouse at 500 Pearl Street on July 10, 1997, at 9:15 a.m.

SO ORDERED.