TIMES MIRROR MAGAZINES, INC., Plaintiff,

v.

**FIELD & STREAM LICENSES COMPANY and Jerome V. Lavin, Defendants.**

No. 96 Civ. 9275(DC).

United States District Court, S.D. New York.

June 30, 2000.

---

Katten Muchin & Zavis, by Antony J. McShane, Kristin J. Achterhof, Robert C. Kimmeth, Chicago, IL, for plaintiff.

Fross Zelnick Lehrman & Zissu, P.C., by Roger L. Zissu, Craig S. Mende, New York City, for defendants.

### OPINION

CHIN, District Judge.

In this case, plaintiff Times Mirror Magazines, Inc. ("Times Mirror") asserts claims against defendants Field & Stream Licenses Company ("FSLC") and Jerome V. Lavin for breach of contract and trademark infringement arising out of the parties' longstanding concurrent uses of the "Field & Stream" trademark. Both parties, or their predecessors, have been using the Field & Stream mark for nearly a century. In the mid–1980s, the parties formalized their pre-existing concurrent use rights in a co-existence agreement, which was modified by two subsequent agreements in 1991 and 1994 (collectively, the "Co–Existence Agreements"). In addition, the parties entered into a licensing agreement that permitted FSLC to use cover art from Times Mirror's Field & Stream Magazine on apparel (the "1994 Joint Licensing Agreement License"). Finally, in 1995, the parties entered into a settlement agreement (the "Settlement Agreement" or the "1995 Agreement") that purportedly settled all of the outstanding disputes between them.

Plaintiff now contends that defendants have breached their obligations under the Co–Existence Agreements, the 1994 Joint Licensing Agreement License, and the Settlement Agreement. Times Mirror also claims that defendants have infringed upon its rights in the Field & Stream mark by expanding their use of the mark into product areas that the public associates with Times Mirror's Field & Stream Magazine. Plaintiff seeks rescission of all agreements between the parties, the delivery and destruction of all allegedly infringing FSLC products, and the cancellation of many of FSLC's trademark registrations and registration applications, as well as monetary and other injunctive relief.

Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56, arguing that plaintiff has failed to raise any genuine issues of material fact as to (1) whether defendants breached their obligations under any of the parties' agreements and (2) whether defendants have infringed plaintiff's rights with respect to the use of the Field & Stream mark. For the reasons that follow, defendants' motion is granted. Judgment will be entered dismissing the complaint in all respects.

### BACKGROUND

#### A. The Parties

Times Mirror or its predecessor-in-interest, CBS Magazines, a division of CBS, Inc. ("CBS"), has published Field & Stream Magazine (the "Magazine") continuously since 1895. The Magazine focuses on hunting, fishing, and other outdoor themes and products, and has a circulation of approximately 1.75 million monthly subscribers and 12.5 million monthly readers. In addition to featuring articles that discuss or compare the merits of products of interest to hunters, fisherman, sportsmen, and campers, the Magazine also carries numerous advertisements offering products and information of special interest to its readers, such as hunting, fishing, and camping gear, and contains classified advertisements for such products as well. Times Mirror has licensed the Field & Stream mark for use in connection with a variety of products and services related to hunting, fishing, and other outdoor themes, including a television series and radio program based on The Magazine. Times Mirror has registered the Field & Stream mark in the United States Patent and Trademark Office (the "USPTO") for certain goods and services.

FSLC was one of the businesses owned by the Gordon & Ferguson Merchandising Company, which was, in turn, a wholly-owned subsidiary of the Gordon & Ferguson Company (together, "Gordon & Ferguson" or "G & F"), a company that has been in business since 1871. Beginning as early as 1915, Gordon & Ferguson sold goods under the name "Field & Stream," including clothing and other items designed and marketed expressly for use in outdoor activities, such as hunting and fishing. Formed in 1984, FSLC is a family-owned business engaged in licensing the Field & Stream mark to third-parties who manufacture and sell apparel bearing the Field & Stream name. Lavin, a member of the family that owned Gordon & Ferguson, took over the management of the family-owned business in 1976 and is now FSLC's principal. FSLC owns numerous federal trademark registrations for the Field & Stream mark for various goods.

## B. *The Co–Existence Agreements*

For many years, the parties' predecessors, CBS and Gordon & Ferguson, used the Field & Stream mark concurrently with virtually no conflict. G & F confined its use of the mark primarily to items of apparel, while CBS used the mark on the Magazine and hunting, fishing, and other outdoor products that were similar to those featured in the Magazine. According to Times Mirror, the parties' informal understanding with respect to their concurrent use of the mark began to break down shortly after Lavin assumed control of G & F. Times Mirror contends that in 1981, Lavin began expanding G & F's use of the Field & Stream mark beyond items of apparel—at first, steering clear of products that fell within CBS's claimed "domains" of hunting, fishing, and outdoor products, but eventually expanding G & F's licensing activities to a point that brought the parties in direct conflict with one another.

### 1. *The 1984 Agreement*

Accordingly, on April 1, 1984, the parties entered into a formal concurrent trademark use co-existence agreement (the "1984 Agreement"). The 1984 Agreement was intended to permit the parties to take mutually acceptable steps to enhance the distinctions between their respective uses of the Field & Stream mark and to set forth "the entire understanding of the parties hereto relating to the subject matter hereof." (Pl.Ex.5, ¶ 16).

The 1984 Agreement specified the products as to which each party would have the exclusive right to use or license the Field & Stream mark:

CBS hereby irrevocably acknowledges, during the term of this Agreement, the exclusive rights, worldwide, of G & F in and to the use of the trademark FIELD & STREAM on and in connection with items of apparel.[1] ...

CBS agrees that it will not hereafter contest the use of FIELD & STREAM by G & F ... and will not oppose or contest any trademark application therefor, so long as the provisions of this Agreement shall remain in effect.

\* \* \* \* \* \*

G & F hereby irrevocably acknowledges, during the term of this Agreement, the exclusive rights, worldwide, of CBS in and to the use of the trademark FIELD & STREAM ... for magazines and publications in general, and FIELD & STREAM magazine in particular, as well as on and in connection with such other products, related to hunting, fishing and associated outdoor activities, as have been offered and sold by CBS through its FIELD & STREAM magazine under such trademark in the past ... including by way of example but not limitation figurines, prints, books, and

---

1. The 1984 Agreement defined "apparel" as "any item of clothing or dress which may normally be worn on the human body, exclud-

ing, however, jewelry, boots, shoes and other items of footwear." (Pl.Ex.5, ¶ 1(a)).

binoculars, but excluding apparel products. It is understood that CBS shall have a period of 6 months from the date of execution of this Agreement in which to expand the list of products contained in the preceding sentence based upon its review of prior offerings through FIELD & STREAM magazine.

G & F agrees it will not hereafter contest the use of FIELD & STREAM by CBS as provided ... above, and will not oppose or contest any trademark applications therefor, so long as the provisions of this Agreement shall remain in effect.

(Pl.Ex.5, ¶¶ 2(a), (b); 3(a), (b)). G & F also granted to CBS the "irrevocable, royalty-free right and license to use the trademark FIELD & STREAM on and in connection with the sale and distribution" of certain apparel items, namely socks, men's ties, and women's scarves. (Id., ¶ 4(a)). The license was exclusive with respect to socks, but non-exclusive with respect to men's ties and women's scarves. (Id. at ¶ 4(b)).

In addition, the 1984 Agreement identified certain products on which *neither* party would use the Field & Stream mark:

G & F recognizes and acknowledges the concern of CBS over the use of the FIELD & STREAM trademark on and in connection with the following merchandise which is extensively advertised in FIELD & STREAM magazine, namely, fishing rods, reels, lures, lines, guns, shells and bullets, tents, and sleeping bags. Accordingly, G & F shall cooperate with CBS to the end that such merchandise not be licensed or sold by G & F under the FIELD & STREAM trademark.... CBS agrees that it will not manufacture, sell, or license such items.

(Pl.Ex.5, ¶ 12).

In response to CBS's concern about the similarity between the parties' logos, G & F agreed to "make such changes in its logo and ampersand ... as will make the two logos dissimilar in appearance." (Pl.Ex.5, ¶ 7(a)). The parties further agreed that "if

and when either party plan[ned] to make changes in the form of its logo or ampersand in the future, such party [would] show the other party the proposed changes prior to their adoption so as to allow the other party to comment on the proposed new logo or ampersand; it being understood that the intention of the parties at all times [was] to make their respective logos dissimilar and sufficiently distinctive to avoid a likelihood of confusion." (Id., ¶ 7(b)).

In January of 1987, FSLC acquired from Gordon & Ferguson all of the trademarks then owned by G & F, including the Field & Stream marks and in particular, the right to use the Field & Stream mark on certain apparel items. Thereafter, in 1989, FSLC filed five federal intent-to-use ("ITU") trademark registration applications for various products and services, including hunting knives, hunting seats, and utility boxes; retail sporting goods and services; flashlights, clocks, watches, and desk accessories; sunglasses; and retail clothing store services. (Compl., ¶ 13).

### 2. *The 1991 Agreement*

Times Mirror objected to FSLC's ITU applications, and accordingly, the parties revisited their prior agreement and entered into a second agreement on October 17, 1991 (the "1991 Agreement"). The 1991 Agreement reconfirmed most of the 1984 Agreement, explicitly stating that the terms of the prior agreement were binding on FSLC and Times Mirror, as successors to G & F and CBS, respectively, with certain exceptions. (Pl.Ex.13, ¶ 1).

First, the 1991 Agreement deleted the 1984 provision that allowed Times Mirror to use the Field & Stream mark on and in connection with men's ties and women's scarves; Times Mirror retained the right to use the mark on socks. (Pl.Ex.13, ¶ 1(a)). Second, the provision in the 1984 Agreement that prohibited both parties from using the Field & Stream mark on fishing rods, reels, lures, lines, guns, shells

and bullets, tents, and sleeping bags was amended to grant to Times Mirror the exclusive right to license such products, with the exception of tents and sleeping bags; these two products remained off-limits to both parties. (*Id.*, ¶ 1(b)). Third, FSLC agreed to amend three of its five trademark registration applications and withdraw another one entirely,[2] in exchange for Times Mirror's withdrawal of its opposition to the three amended applications and its promise not to oppose the remaining unamended application. (*Id.*, ¶¶ 4, 5).

On November 17, 1993, FSLC filed an additional 22 ITU trademark registration applications encompassing 165 separate products or product categories as to which FSLC claimed it intended to use the Field & Stream mark; some of the products listed in the applications related to hunting, fishing, and similar outdoor activities.

### 3. *The 1994 Agreement*

To resolve the dispute precipitated by FSLC's ITU applications, Times Mirror and FSLC entered into a third agreement on March 18, 1994 (the "1994 Agreement"). In the 1994 Agreement, Times Mirror and FSLC again confirmed the validity of the 1984 Agreement, as amended by the 1991 Agreement, and confirmed that they were to continue to be bound by its terms and conditions except as further amended by the 1994 Agreement. (Pl.Ex. 18 at 1).

Like the 1991 Agreement, the 1994 Agreement modified several provisions of the 1984 Agreement. The 1994 Agreement deleted Times Mirror's right to license the Field & Stream mark for use on socks (Pl.Ex.18, ¶ 1(a)), but reserved to

Times Mirror the exclusive right to use the Field & Stream mark in connection with tents and sleeping bags, products that had previously been off-limits to both parties, in addition to those products on which it had previously been granted the exclusive right to use the Field & Stream mark in the 1991 Agreement—namely, fishing rods, reels, lures, lines, shells and bullets. (*Id.*, ¶ 1(c)).

In addition, the 1994 Agreement expressly stated that:

[t]he acknowledgment of rights contained in paragraph 1., above [relating to the parties' respective rights to use the Field & Stream mark in connection with the enumerated products]: (a) shall be limited to the products specifically referred to in paragraph 1., above; (b) shall not be deemed to create or limit any rights to the trademark Field & Stream with respect to any other product, including, without limitation, other camping products; and (c) shall not be used in any dispute between Times Mirror and [FSLC] to expand or limit the rights of Times Mirror or [FSLC] to the trademark Field & Stream with respect to any other product, including other camping products.

(*Id.*, ¶ 11).

### 4. *The 1994 Joint Licensing Agreement*

In early 1994, Lavin and FSLC sought to develop apparel items, such as sweatshirts, bearing the art from covers of the Magazine. Times Mirror apparently approved of the idea, and, accordingly, on July 1, 1994, the parties entered into a letter agreement by which Times Mirror agreed to license certain cover art to de-

---

**2.** In general, FSLC agreed to delete specific descriptions of certain products from its trademark registration applications to make clear that those products were not to be manufactured and marketed expressly as products designed for hunting or fishing. For example, FSLC agreed to amend the description of goods in one application by replacing "hunting knives" with "pocket knives and cutlery, and table knives, not designed for use primar-

ily for hunting or fishing." (Pl.Ex.13, ¶ 4(a)). In addition, FSLC agreed to delete from one application certain products that were exclusively devoted to hunting activities, such as gun accessories, practice targets, hunting seats, and archery gloves. (*Id.*, ¶ 4(b)(i)–(ii)). FSLC also agreed to withdraw its application relating to retail sporting goods and services in its entirety. (*Id.*, ¶ 4(c); *see* Compl., Ex. E at 5).

fendants for use on certain items of apparel. (*See* Pl.Ex. 19).

The 1994 Joint Licensing Agreement contained three parts. First, Times Mirror agreed to license certain Magazine cover art and logos to FSLC for use in connection with certain items of apparel to be sold by The Orvis Company, Inc. ("Orvis") in a single issue of its mail-order catalog. (*Id.* at 1–3). Second, Times Mirror agreed to allow FSLC or one of the companies it controlled to use certain Magazine covers on sweatshirts, knit shirts, and T-shirts for a five-year period, with no restriction on the retailers to whom such products could be sold. (*Id.* at 3–4). Third, Times Mirror granted to FSLC a five-year license for the use of certain Magazine covers on approved apparel products and related packaging by companies *not* controlled by FSLC; in other words, FSLC could license the right to use the Magazine's cover art on apparel to unaffiliated licensees and/or sublicensees. (*Id.* at 4–5).

In return, Times Mirror would receive royalty payments based on a percentage of net sales of the products sold by Orvis or by FSLC and its associated companies and an equal share of the licensing fees received by FSLC from the unaffiliated licensees or sublicensees for products bearing Magazine covers. In addition, Times Mirror had certain approval rights with respect to all products produced under the Joint Licensing Agreement.

### 5. *The Settlement Agreement*

Apparently still concerned about the trademark registration applications filed by defendants in November 1993, Times Mirror entered into yet another agreement with FSLC on June 6, 1995, the Settlement Agreement. (Pl.Ex.24). This agreement, entitled "Field & Stream ITU and Related Matters Settlement Agreement," was intended to resolve the dispute over FSLC's 21[3] pending ITU trademark applications and related matters and to produce "a permanent resolution of the conflicting uses of the FIELD & STREAM mark." (Compl., ¶ 17).

First, the Settlement Agreement allocated specific products listed in the ITU applications to either Times Mirror or FSLC. Paragraph 1 of the Settlement Agreement specified which party would receive the exclusive right to use the Field & Stream mark in connection with certain products listed in FSLC's pending ITU trademark registration applications. A particular product would either be reserved exclusively to Times Mirror, in which case FSLC agreed to delete that product from its application, or to FSLC, in which event the application for those products would remain unaltered. (*See* Pl.Ex. 24, ¶ 1). For example, trolling motors for water-going craft were reserved exclusively to Times Mirror, and FSLC was required to delete that product from its ITU application; electric blankets were reserved exclusively to FSLC, and its corresponding application would remain unchanged.[4] (*Id.*, ¶ 1(b), (d)).

Next, the Settlement Agreement addressed the remaining products covered by

---

**3.** On December 22, 1994, defendants abandoned one of the 22 applications it had filed in November 1993.

**4.** The other products reserved exclusively to Times Mirror under the Settlement Agreement were "non-chemical fuel additives for two-cycle gasoline engines," and "electric depth finders." The other products reserved exclusively to FSLC were "floatation vests for life saving purposes," "portable refrigeration devices," "watches, cufflinks, jewelry, cases for watches and clocks," "umbrellas, trunks for traveling and travel bags," "pillows, wood

chests and storage boxes except boxes designed and sold exclusively as fishing tackle boxes," "non-metal decorative storage boxes, wastepaper baskets and tissue holders," and "towels, sheets and pillow cases, comforters, table cloths and napkins of fabric." (Pl. Ex.24, ¶ 1). With respect to the category including "pillows, wood chests and storage boxes," FSLC was required to amend its trademark registration application to clarify that its exclusive rights specifically excluded "boxes designed and sold exclusively as fishing tackle boxes." (*Id.*).

FSLC's pending ITU trademark registration applications that were not allocated to the parties in paragraph 1 of the agreement. Paragraph 3 provided that the first party to use or license the Field & Stream mark in connection with a product would have the exclusive right to register the trademark for that particular product without opposition from the other party (the "first use provision"). (Pl.Ex.24, ¶ 3). Once a party made the first use of the mark on a particular product, that product would then be deemed to be reserved exclusively to that party, if the party complied with certain notice requirements. (*Id.*, ¶ 3(a)). If the party commenced the use and sale of the product itself, the party had to (1) give written notice to the other party; and (2) upon written request of the other party, provide "substantial evidence" of such use, which included all of the following: (a) written contracts; (b) product designs, samples, or prototypes; (c) purchase orders or paid invoices; and (d) product sales material or advertising. (*Id.*, ¶ 3(b)).

If, on the other hand, the party sought to invoke the first use provision on the basis of licensing the Field & Stream mark to a third party, different notification requirements applied. If a party commenced negotiations with a third party to license a product covered by the first use provision, it was required to notify the other party of such negotiations, and for a 90–day period thereafter, the negotiating party would have the exclusive right to consummate a license with the third party.[5] Within 30 days of the execution of any license agreement, the licensing party was required to (1) provide the other party with a copy of the license agreement; and (2) certify to the other party that the

licensee was (a) not an "affiliate"[6] of the licensing party, (b) had an operating business, and (c) was in the product business for the goods to be licensed or had the qualifications to be in such business. (Pl. Ex.24, ¶ 3(c)). Furthermore, upon written request of the nonlicensing party, the licensing party had to provide certain items, if available, to demonstrate the bona fide nature of the license agreement, including (1) product designs, samples or prototypes of the product licensed; and (2) samples of product sales material or advertising. (*Id.*).

Paragraph 3 further provided that each party would have alternating 12–month periods within which to attempt to license certain products—namely, row boats, speed boats, canoes, inflatable boats, boat trailers, canoe paddles, boat oars, boat ladders, maps, boat covers, and non-trolling motors for water going craft—to third parties. Times Mirror was to get the first twelve-month period, commencing with the date of execution of the agreement; if Times Mirror did not license any or all of the listed products within that time period, Licences would then have twelve months to attempt to license any unlicensed product, and the parties would continue to alternate every twelve months thereafter. (*Id.*, ¶ 3(d)).

With respect to future applications filed with the USPTO, the parties agreed not to file any intent-to-use trademark registration applications in the future; all future trademark registration applications would be based on *actual* use or licensing of a particular product. (Pl.Ex.24, ¶ 4(b)). Further, each party agreed that it would not oppose a use application filed by the other party unless the application was "confusingly similar" to a product for

---

**5.** If the negotiating party failed to finalize a license deal, it was required to notify the other party, which could then seek to negotiate a license for that product itself, provided that it waited for one year before negotiating with the third party potential licensee that had initially been involved in negotiations. (Pl.Ex.24, ¶ 3(c)).

**6.** An affiliate was defined as any subsidiary of the licensing party; any person or entity controlled by, under common control with, or controlling the licensing party; or any joint venture or partnership in which the licensing party is a partner or joint venturer. (Pl. Ex.24, ¶ 3(c)).

which the opposing party had already filed a use application or obtained a trademark registration. In addition, each party agreed that it would use its "best efforts not to use, license, or apply for registration of the [Field & Stream mark] for a product that is confusingly similar to a product used, licensed, or registered by the other party" under the mark. (*Id.*, ¶ 4(c)). Times Mirror also agreed to withdraw the oppositions it had already filed with the USPTO and further promised not to oppose any of the remaining ITU applications. (*Id.*, ¶ 4(a)).

Paragraph 2 of the Settlement Agreement addressed how any future disputes between the parties arising out of the use or licensing of products covered in the agreement would be handled. Specifically, the agreement provided:

> If a party hereto has a product specified in paragraph 1 above or other parts of this Agreement to be reserved exclusively to that party (the "Use Party"), the other party ("Other Party") and any person, firm or entity claiming or deriving rights from the Other Party shall not at any time file any opposition or cancellation with the U.S. Patent and Trademark Office ("PTO"), commence any civil proceeding for damages or injunctive relief, or make any other legal claim that directly or indirectly would hinder the Use Party's use of the [Field & Stream mark] for a product reserved exclusively to the Use Party or prevent the PTO from issuing a trademark registration to the use Party based upon an application for the [Field & Stream mark] for such products or from renewing any such trademark registration obtained by the Use Party for the [Field & Stream mark].

(Pl.Ex.24, ¶ 2(c)).

Finally, the Settlement Agreement contained a merger clause:

> This Agreement constitutes the complete and exclusive statement of agreement between the parties hereto with respect to [FSLC's 21] ITU Applications and related subject matter hereof and supersedes all prior written and oral agreements or statements by and between the parties hereto. No representation, statement, condition or warranty not contained in this Agreement will be binding on the parties hereto or have any force or effect whatsoever.

(Pl.Ex.24, ¶ 10).

### C. *FSLC's Actions After the Settlement Agreement*

In or around June 1995, FSLC gave notice to Times Mirror that it had entered into negotiations with a prospective licensee, National Buying Syndicate ("NBS"), to manufacture and/or sell 32 products under the Field & Stream mark, pursuant to the first use provision of the Settlement Agreement. (Pl.Mem. at 21).

Next, during a three-month period beginning in July 1995, and also pursuant to the first use provision, FSLC entered into a series of five licensing agreements with six companies—Bimini Bay Outfitters ("Bimini"), Folsom Corporation ("Folsom"), Casual Lifestyles ("Casual"), Adventurous Products ("Adventurous"), A Sporting Frame of Mind ("Sporting Mind"), and Waldoch Crafts ("Waldoch")— for more than 35 different products, including furniture, toys, vehicles, and a variety of camping gear and accessories, and notified plaintiff of the agreements. (Compl., ¶ 18(c); Pl.Mem. at 22–23).

FSLC later entered into additional license agreements with third parties. In November 1995, defendants licensed the Field & Stream mark to Triad Sportswear ("Triad") for numerous items of apparel designed for hunting. (Pl.Ex.51). FSLC entered into a second license agreement with Triad in August 1996, granting Triad the right to use the Field & Stream mark on various apparel items, including apparel designed exclusively for fishing. (*Id.*). In addition, in January 1996, FSLC licensed the mark to Suntime International, Inc. ("Suntime") for use on watches, and Sun-

time manufactured and sold watches bearing the mark. (Pl.Mem. at 27; Pl.Ex. 27, 59).

Finally, according to plaintiff, FSLC has attempted to associate its products with the Magazine by "adopting and using in its business" the Magazine itself, as well as "hunting and fishing scenes" and logos that conjure up associations with the Magazine, and "strategic language" that connotes the Magazine. (Pl.Mem. at 34–35). For example, plaintiffs claim that FSLC displayed an edition of the Magazine at its booth at the August 1998 Outdoor Retailer Trade Show. (Compl., ¶ 18(e)(i); Pl.Mem. at 35). Times Mirror also contends that defendants used the phrases "Since 1871" and "Gear for the Great Outdoors" in conjunction with its products in an attempt to align themselves with the Magazine, which was first published in the late 19th century and bears the slogan "The Soul of the American Outdoors." (Compl., ¶ 18(e)(ii) & (iii)).

### D. *The Instant Action*

Times Mirror filed suit on December 10, 1996, asserting claims for breach of contract, trademark infringement, and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, and trademark infringement and unfair competition under New York common law. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that as a matter of law, no reasonable jury could conclude either that defendants (1) breached any of the parties' agreements, or (2) infringed Times Mirror's trademark rights under federal or state law.

### DISCUSSION

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348. To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. As the Supreme Court stated in *Anderson*, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

With these standards in mind, I turn to defendants' motion for summary judgment.

### A. *Breach of Contract Claims*

FSLC contends that summary judgment should be granted on Times Mirror's breach of contract claims because the unambiguous terms of the five agreements between the parties expressly permit the conduct of which plaintiff complains. As a

matter of law, defendants argue that even if plaintiff could prove each of its allegations regarding defendants' actions, the majority of those actions do not constitute any breach of the parties' agreements. Moreover, even if the few remaining alleged infractions did constitute a breach of the agreements, FSLC asserts that such breaches are either immaterial or have been waived by Times Mirror. As a result, no reasonable trier of fact could find in favor of Times Mirror on its breach of contract claims, according to defendants.

In response, Times Mirror argues that summary judgment is inappropriate because genuine issues of fact exist as to the intent of the parties and the meaning of the agreements. Plaintiff further contends that the ambiguities in the parties' contracts create genuine issues of material fact as to whether defendants materially breached the agreements by (1) encroaching into what Times Mirror claims are its exclusive domains of use by using or licensing the Field & Stream mark in connection with products generally related to hunting, fishing, and outdoor activities; (2) entering into sham negotiations or licenses with third parties for the use of the Field & Stream mark on various products specifically for the purpose of capturing fields of use; (3) developing, marketing, and selling or offering for sale a utility box designed to be used as a fishing tackle box; and (4) filing with the USPTO false statements attesting to the use of the Field & Stream mark on various products.[7]

I find Times Mirror's contentions to be without merit. Analyzing only the breach claims that occurred after the Settlement Agreement, because it represented the "complete and exclusive statement of agreement" and settled all disputes outstanding between the parties at the time of the agreement's execution, I conclude as a matter of law that the majority of the actions of which Times Mirror complains are expressly permitted by the unambiguous language of the agreements. The isolated contract breaches that occurred after the Settlement Agreement was executed are *de minimis* violations that do not constitute a material breach of that agreement. Moreover, Times Mirror continued to enter into agreements with FSLC and accept licensing revenues from FSLC under the terms of the Settlement Agreement; by electing to continue performance under the contract, plaintiff thereby waived its right to terminate the contract on the basis of defendants' breach.

### 1. *The Meaning of the Agreements*

The rules of contract interpretation are well-settled and are set forth in the summary judgment context in *Seiden Associates, Inc. v.. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir.1992):

> In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. When the question is the contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.

---

**7.** Times Mirror also alleges that FSLC breached the parties' agreements by displaying a copy of the Magazine at a trade show and adopting certain slogans similar to slogans utilized by the Magazine (Compl., ¶ 18(e)(i)–(iii); Pl.Mem. at 35–36), but these contentions are more appropriately analyzed as unfair competition claims, for plaintiff essentially contends that FSLC unfairly attempted to associate its products with the Magazine. None of the parties' agreements contain any provisions addressing this subject matter.

*Id.* at 428 (citations omitted); *see also Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993) (summary judgment may be granted "only where the agreement's language is unambiguous and conveys a definite meaning"); *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 298 (S.D.N.Y.1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous") (citations omitted), *aff'd,* 166 F.3d 1201 (2d Cir.1998).

■ Therefore, in a contract interpretation case under New York law,[8] the Court must first decide whether the contract is ambiguous. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 67 F.3d 435, 443 (2d Cir.1995) (citing *Sayers,* 7 F.3d at 1094). A contractual provision will be deemed ambiguous "whenever it admits of more than one interpretation 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.'" *MG Refining & Mktg., Inc. v. Knight Enters., Inc.,* 25 F.Supp.2d 175, 180 (S.D.N.Y.1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir. 1996)); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 152 (2d Cir.1995). Conversely, contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers,* 7 F.3d at 1095 (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)); *see also M.H. Segan Ltd. Partnership v. Hasbro,* 924 F.Supp. 512, 525 (S.D.N.Y.1996).

Moreover, "'language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would strain[ ] the contract language beyond its reasonable and ordinary meaning.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)); *see also Seiden Assocs.,* 959 F.2d at 428.

■ If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract. *See Stroll v. Epstein,* 818 F.Supp. 640, 643 (S.D.N.Y.), *aff'd,* 9 F.3d 1537 (2d Cir.1993); *Sterling Drug Inc. v. Bayer AG,* 792 F.Supp. 1357, 1365–66 (S.D.N.Y.1992), *aff'd in part, remanded in part,* 14 F.3d 733 (2d Cir.1994); *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.,* 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 255 N.E.2d 709 (1969), *modified on other grounds,* 26 N.Y.2d 969, 311 N.Y.S.2d 13, 259 N.E.2d 483 (1970). If the language of a contract is ambiguous, however, extrinsic evidence of the parties' intent is admissible. *Space Imaging Europe, Ltd. v. Space Imaging L.P.,* 38 F.Supp.2d 326, 334 (S.D.N.Y.1999) (citing *Seiden Assocs.,* 959 F.2d at 428).

Analyzing plaintiff's claims under these standards, I conclude that each of the parties' agreements is unambiguous on its face and as a result, I need not look beyond the four corners of the contracts to determine the parties' obligations. In examining the unambiguous contract language, I find that there are no genuine issues of material fact regarding the meaning of the 1984 Agreement and the subse-

---

8. In the Settlement Agreement, the parties agreed that New York law would govern the interpretation and enforcement of the contract, without giving effect to New York's choice of law rule. (Pl.Ex.24, ¶ 9).

quent amendments thereto, the Joint Licensing Agreement, or the Settlement Agreement. While Times Mirror repeatedly labels FSLC's reading of the agreements as "hypertechnical," in reality FSLC's interpretation is a correct, literal reading of the plain language of the contracts that is faithful to the spirit and intent of the agreements. I address each agreement in turn.

### a. *The 1984 Agreement and the 1991 and 1994 Amendments Thereto*

Times Mirror argues that the 1984 Agreement "carv[ed] out areas of use" of the Field & Stream mark for each party and "defin[ed] the parties' respective domains" of products on which each could use the mark. (Pl.Mem. at 10, 11). According to plaintiff, under the 1984 Agreement, Times Mirror obtained the exclusive right to use the Field & Stream mark in connection with *all* products related to hunting, fishing, and associated outdoor activities, while FSLC obtained the exclusive right to use the Field & Stream mark in connection with items of apparel. Furthermore, Times Mirror claims that this purported division of domains in the 1984 Agreement—hunting, fishing, and outdoor products to Times Mirror, apparel products to FSLC—was the foundation upon which the 1991 and 1994 Agreements were based, and that these subsequent amendments to the 1984 Agreement confirmed and maintained this basic division of product areas.

■ A close reading of the actual text of the 1984 Agreement, however, reveals that this position is untenable. Contrary to Times Mirror's assertions, no reasonable jury could find that these agreements granted to Times Mirror broad exclusivity for *all* products related to hunting, fishing, and related outdoor activities. Rather, these agreements provide that only *certain* specified hunting, fishing, and outdoor products are exclusively reserved to Times Mirror.

In the 1984 Agreement, G & F (FSLC's predecessor) recognized that CBS (Times Mirror's predecessor) had an exclusive right to use the Field & Stream mark in connection with magazines and publications in general, and the Magazine in particular, as well as in connection with "such other products, related to hunting, fishing and associated outdoor activities, *as have been offered and sold by CBS through its FIELD & STREAM magazine under such trademark in the past* ... including by way of example but not limitation figurines, prints, books, and binoculars, but excluding apparel products." (Pl.Ex.5, ¶ 3(a)) (emphasis added). In other words, CBS had exclusivity only with respect to products it had offered and sold through the Magazine under the Field & Stream trademark in the past.[9] CBS did *not* receive the expansive right to *all* hunting, fishing, and related outdoor products that Times Mirror now claims, and no reasonable jury could agree with Times Mirror's broad interpretation of the 1984 Agreement in this respect. Accordingly, the 1984 Agreement did not prohibit FSLC from using the mark on products relating to hunting, fishing, and outdoor activities, so long as they were not products that had "been offered and sold by CBS through its FIELD & STREAM magazine under such trademark in the past."

In support of its claim that the 1984 Agreement reserved the domains of hunting, fishing, and outdoor products to CBS exclusively, Times Mirror points to the provision of the agreement that prohibited G & F from licensing or selling products that were extensively advertised in the Magazine, "namely fishing rods, reels, lures, lines, guns, shells and bullets, tents, and sleeping bags." (Pl.Ex.5, ¶ 12). Ac-

---

9. CBS had six months from the date of execution of the 1984 Agreement to augment the list of products ("figurines, prints, books, and binoculars") detailed in the agreement, based on its review of its prior offerings. (Pl.Ex.5, ¶ 3(a)). There is no evidence that CBS ever identified any such previously-offered products.

cording to plaintiff, this prohibition demonstrates that the parties intended to allocate the hunting, fishing, and outdoor activities domains to CBS by "identif[ying] certain products which were within Times Mirror's domain on which defendants could not use the [Field & Stream] mark." (Pl.Mem. at 11). Times Mirror fails to point out, however, that CBS was *also* prohibited from using the Field & Stream mark on any of the enumerated products. Under plaintiff's logic, the ban against CBS's using the mark on the various hunting, fishing, and outdoor products demonstrates that those general areas of use were off-limits to CBS as well. Such an interpretation strains the plain language of the provision, which clearly and precisely states only that the Field & Stream mark cannot be used on certain products by *either* party; no "domains" or "fields of use" are carved out and assigned to either party by this provision or any other provision in the 1984 Agreement.

Times Mirror's arguments with respect to the meaning and intent of the 1991 and 1994 Agreements are equally unavailing. Times Mirror contends that these amendments to the 1984 Agreement "reinforced" and "reconfirm[ed]" the parties' intention that Times Mirror was to have exclusive rights with respect to products related to hunting, fishing, and outdoor activities, and that FSLC's exclusive rights to license the Field & Stream mark were limited to items of apparel. Times Mirror's reading of the 1991 and 1994 Agreements is misguided primarily because of its erroneous construction of the 1984 Agreement.

Times Mirror is correct in asserting that the 1991 and 1994 Agreements confirmed the prior agreement between the parties.[10] As explained above, however, while the 1984 Agreement granted FSLC the exclu-

sive right to use the mark on apparel, it did *not* grant Times Mirror the exclusive right to use the Field & Stream mark in connection with the general category of goods related to hunting, fishing, and outdoor activities, and it did not limit FSLC's rights to apparel products exclusively. The 1991 and 1994 Agreements could not "confirm" Times Mirror's exclusive right to use the mark in the hunting, fishing, and outdoor domains because such a right never existed.

Times Mirror contends that its interpretation of the original 1984 Agreement is supported by other provisions of the 1991 and 1994 Agreements that, it claims, "clarified" FSLC's exclusive right to use the Field & Stream mark by FSLC on apparel items and Times Mirror's exclusive right to use the mark on hunting, fishing and outdoor products. (*See* Compl., ¶¶ 14, 15; Pl.Mem. at 14–15, 45). For example, plaintiff points out that the 1991 Agreement eliminated Times Mirror's right to use the Field & Stream mark for use on ties and scarves—items of apparel—and at the same time granted it the exclusive right to use the mark in connection with "fishing rods, reels, lures, lines, guns, shells and bullets"—products related to fishing and hunting.

Similarly, Times Mirror notes that the 1994 Agreement eliminated Times Mirror's exclusive right to use the mark in connection with socks (apparel) and granted it the exclusive right to use the mark in connection with tents and sleeping bags (products related to camping, an outdoor activity), in addition to those products enumerated in the 1991 Agreement. In plaintiff's view, the manner in which these particular products were allocated to the parties indicates that the 1991 and 1994 Agreements "reinforced the exclusive ar-

---

**10.** *See* Pl.Ex. 13, ¶ 1 ("The prior Agreement of April 1, 1984 between the parties' predecessors is hereby confirmed and the parties shall continue to be bound by its terms and conditions, as though they were signatories thereto ....."); Pl.Ex. 18, ¶ 1 ("[T]he parties hereby agree that the prior Agreement of April 1, 1984, as amended as of October 17, 1991, between the parties and the parties' predecessors, is hereby confirmed and the parties shall continue to be bound by its terms and conditions, as though they were signatories thereto .....").

eas of rights established by the 1984 Agreement" (Pl.Mem. at 17), with Times Mirror holding the exclusive right to use the mark for all hunting, fishing, and outdoor products.

Times Mirror's interpretation is overbroad, for its attempt to extrapolate an expansive grant of exclusivity for the domains of hunting, fishing, and outdoor products from the 1991 and 1994 Agreements' grant of exclusivity for particular products is unsupported by the actual language of those agreements. The actual text of the 1991 and 1994 Agreements indicates that the intent of the parties was to address their rights only with respect to *specific* products—namely, those products that were the subject of FSLC's ITU trademark registration applications filed in 1989 and 1993, as well as certain specified products that were the subject of the 1984 Agreement.

The contract language cited by Times Mirror as support for its interpretation speaks only to specific products and in no way indicates any intent on the part of the parties to carve out and grant Times Mirror exclusive rights with respect to *all* items related to fishing, hunting, and outdoor activities. (*See* Pl.Ex. 13, ¶¶ 1(b), 4(a)–(c), 5; Pl.Ex. 18, ¶¶ 1(a) & (c)). Indeed, the 1994 Agreement specifically states that the exclusive rights granted to Times Mirror for the use of the mark in connection with fishing rods, reels, lures, lines, guns, shells, bullets, sleeping bags, and tents was to be "limited to the products specifically referred to" therein and "shall not be deemed to create or limit any rights to the trademark Field & Stream with respect to any other product, including, without limitation, other camping products." (Pl.Ex.18, ¶ 11).

Furthermore, to the extent that Times Mirror claims that FSLC's right to use the Field & Stream mark was limited solely to apparel items (*see* Pl.Mem. at 10, 12; Compl., ¶¶ 14, 15), that argument is undercut by the fact that the 1991 Amendment allowed FSLC to include numerous non-apparel items in several of its ITU applications, without objection from Times Mirror. For example, while FSLC agreed to delete "hunting seats" and "utility boxes sold empty" from one of its applications, change "hunting knives" to "pocket knives and cutlery, and table knives, not designed primarily for hunting or fishing," and amend its application covering sunglasses to read "sunglasses not designed for use primarily for hunting or fishing," FSLC was nevertheless permitted to go forward with these applications as amended, and obviously, the products described above had nothing to do with apparel.

Hence, nothing in either of the amendments to the 1984 Agreement provides that Times Mirror was to have exclusive rights to license products relating generally to hunting, fishing, and outdoor activities, and that FSLC was to have exclusive rights only with respect to items of apparel. If the parties had intended this to be the case, Times Mirror would have insisted that FSLC delete from its pending trademark registration applications all non-apparel products. It did not do so.

In addition, Times Mirror's "allocation of domains" contention would render paragraph 11 of the 1994 Amendment—in which the parties agree that the right to use the Field & Stream mark was limited to the enumerated products and that no additional rights were created or limited with respect any other product, including camping products—meaningless. I am obliged to read the agreements in a manner that gives full force and effect to all clauses contained therein. *See United States v. Epstein*, 27 F.Supp.2d 404, 410 (S.D.N.Y.1998) (citing *Lloyds Bank PIC v. Republic of Ecuador*, No. 96 Civ. 1789(DC), 1998 WL 118170, at *8 (S.D.N.Y. Mar.16, 1998)). There would have been no need to include a provision stating that the 1994 Agreement was not to be construed as limiting either party's rights with respect to products not addressed in the agreement if the parties had intended that Times Mirror have ex-

clusive rights with respect to the broad categories of hunting, fishing, and outdoor activities and that FSLC's exclusive rights be limited to items of apparel.

I conclude as a matter of law that the 1984 Agreement and the 1991 and 1994 amendments thereto are susceptible of only one reasonable interpretation: they provide that (1) Times Mirror had the exclusive right to use the mark in connection with (a) magazines and publications in general, and the Magazine in particular, (b) products that had "been offered and sold by CBS through its FIELD & STREAM magazine under such trademark in the past," and (c) fishing rods, reels, lures, lines, guns, shells and bullets, tents, and sleeping bags; (2) FSLC had the exclusive right to use the mark in connection with (a) items of apparel (including socks) and (b) all products covered by its federal trademark registration applications, to the extent that they were amended pursuant to the 1991 Agreement, and excluding those products that were deleted from the applications under the 1991 Agreement; and (3) the parties had equal rights to license "any other product, including, without limitation, other camping products," that were not covered in paragraph 1 of the 1994 Agreement. These agreements did not grant Times Mirror the exclusive right to license the mark in connection with general product categories relating to hunting, fishing, and outdoor activities, nor did they limit FSLC to use of the mark only in connection with items of apparel. Accordingly, Times Mirror's interpretation of the 1984, 1991, and 1994 Agreements is rejected.

**b. *The 1994 Joint Licensing Agreement***

There is no genuine issue of material fact as to the meaning of the so-called "Orvis Agreement." As plaintiffs concede, the Joint Licensing Agreement permits FSLC to sell apparel bearing cover art from the Magazine not only to Orvis, but also to companies other than Orvis, subject to certain approval and other requirements as set forth above. (*See* Pl.Ex. 19).

**c. *The Settlement Agreement***

█ Finally, to the extent that Times Mirror contends that the Settlement Agreement further solidified the division in domains established by the Co–Existence Agreements, this argument, too, is rejected, for no reasonable jury could find that Times Mirror's interpretation is correct.

Times Mirror argues that the Settlement Agreement perpetuated the "domain right allocation" set forth in the 1984, 1991, and 1994 Agreements. (*See* Pl.Mem. at 20). As discussed above, however, those earlier agreements did not allocate "domains" of products to each party, and thus the Settlement Agreement could not confirm such a division. Even if certain domains had been allocated in the manner plaintiff claims—hunting, fishing, and related outdoor products to Times Mirror, apparel and related items to FSLC—the terms of the 1995 Agreement are *not* "consistent with domain right allocation," for several of the items reserved to FSLC had little or nothing to do with "apparel or related items."

For example, the Settlement Agreement granted to FSLC the exclusive right to use the Field & Stream mark on the following non-apparel items: "flotation vests for life saving purposes" (Pl.Ex.24, ¶ 1(c)); "electric blankets" (*id.* ¶ 1(d)); "portable refrigeration devices" (*id.* ¶ 1(e)); "cases for clocks" (*id.* ¶ 1(f)); "umbrellas, trunks for traveling and travel bags" (*id.* ¶ 1(g)); "pillows, wood chests and storage boxes except boxes designed and sold exclusively as fishing tackle boxes" (*id.* ¶ 1(h)); "non-metal decorative storage boxes, wastepaper baskets and tissue holders" (*id.* ¶ 1(i)); and "towels, sheets and pillowcases, comforters, table cloths and napkins of fabric." (*Id.* ¶ 1(j)). Not only are the foregoing items not apparel or apparel-related, at least two of these products are clearly related to fishing or boating (flotation vests for life saving purposes) or outdoor activities (portable refrigeration devices).

In addition, under the first use provision of the 1995 Settlement Agreement, FSLC could obtain exclusive rights to the mark for use on numerous other products related to hunting, fishing or outdoor activities, including insect repellent, suntanning lotion, camp stoves, portable propane heaters and propane lamps, camping tables, camping cook-kits, and certain scuba diving equipment. (*See* Pl.Ex. 24, ¶¶ 1, 3(a) & Ex. A thereto). These provisions contradict Times Mirror's assertion that the 1995 Settlement Agreement was "consistent with [the] domain right allocation" set forth in the previous agreements.

Moreover, even if the 1984, 1991, and 1994 Agreements had delineated and assigned "domains" to the parties as Times Mirror claims, the 1995 Settlement Agreement superseded all previous agreements between the parties. Times Mirror contends that the Settlement Agreement superseded the Co–Existence Agreements only with respect to those products included in the 22 ITU applications, but such an interpretation is unreasonably narrow and unsupported by the language of the agreement.

First, the very title of the Settlement Agreement—"Field & Stream ITU *and* Related Matters Settlement Agreement"— suggests that it encompasses more than just the ITU dispute. (Pl.Ex. 24 at 1) (emphasis added). Second, the 1995 Agreement explained that in view of FSLC's 21 pending ITU applications and Times Mirror's filed oppositions to those applications, "the parties desire to settle this controversy ... *and related matters as set forth therein." (Id.* at 2) (emphasis added). Third, the merger clause stated that the Settlement Agreement "constitutes the complete and exclusive statement of agreement between the parties hereto with respect to the ITU Applications *and related subject matter hereof." (Id.,* ¶ 10) (emphasis added). In each of the quoted passages, the use of the words "and related matters" establishes that the parties intended to resolve not only the dispute over the pending ITU applications, but other related disputes as well.

Finally, the meaning of "related matters" is also evident in the context of the Settlement Agreement. The agreement addressed not only the products included in the ITU applications, but also set out rules for the parties' use or license of the mark on products *not* included in the ITU applications: "Neither party will file any future applications to register the Trademark for any product except based on actual use or licensing of the Trademark for such product." (Pl.Ex.24, ¶ 4). Because the rules for future use of the mark on products *other* than those included in the ITU applications were included in this agreement, those rules must be matters "related" to the ITU application controversy and disputes over those non-ITU products would also be "related matters." Accordingly, "related matters" resolved by the Settlement Agreement would include disputes between the parties related to FSLC's use of the mark on products *not* included in the ITU applications that were unresolved at the time of the 1995 Agreement.

If Times Mirror had wanted to limit the Settlement Agreement only to the products listed in the ITU applications, it could have negotiated for such a limitation. *See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* 145 F.3d 481, 487 (2d Cir.1998) ("If the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation."). In any event, even if Times Mirror's interpretation is correct and the Co–Existence Agreements continued in force with respect to non-ITU application products, as discussed above, those prior agreements never granted the domains claimed by plaintiff.

Turning to the remaining provisions of the Settlement Agreement, contrary to plaintiff's assertions, nothing in the agreement prevents either party from "capturing" products listed in the ITU applications by licensing the F & S mark to a third-party. In fact, the first use provision of the 1995 Agreement specifically contemplates such a practice, provided that the specified criteria are followed. As described above, under the first use provision, the first party to use or license the mark on certain products included in the pending ITU application had "the exclusive right to register the [Field & Stream] [t]rademark with respect to such product without opposition from the other party" as long as that party fulfilled the other requirements set forth in the agreement. (Pl.Ex.24, ¶ 3(a)–(c)). Indeed, plaintiffs implicitly concede that the 1995 Settlement Agreement allows for the "capturing" of a field of use; in alleging that defendants breached the agreement, Times Mirror claims that FSLC entered into sham license agreements with certain companies "for the purpose of capturing a field of use *as provided for in the ITU Agreement.*" (Compl., ¶ 18(c)) (emphasis added).

## 2. *Whether FSLC Materially Breached the Agreements*

With the foregoing meanings of the agreements in mind, I turn now to the question of whether defendants materially breached any of the agreements.

Defendants contend that summary judgment should be entered in their favor on plaintiff's contract claims because the conduct of which Times Mirror now complains was expressly permitted by the parties' agreements, and therefore, there was no breach. In response, Times Mirror argues that genuine issues of material fact exist as to whether defendants breached the Co-Existence Agreements and if so, whether those breaches were material. Specifically, Times Mirror alleges that FSLC breached the Agreements by: (1) developing, marketing, and selling or offering to

sell a utility box designed to be used as a fishing tackle box bearing the Field & Stream mark (Compl., ¶ 18(a); Pl.Mem. at 27–31); (2) attempting to capture fields of use by misrepresenting to plaintiff that it was engaged in "substantial and bona fide negotiations" to license the use of the Field & Stream mark to NBS (Compl., ¶ 18(b); Pl.Mem. at 21–22, 49); (3) entering into sham licensing agreements with various companies for the sole purpose of capturing fields of use (Compl., ¶ 18(c); Pl.Mem. at 22–26); (4) developing, manufacturing, and selling or offering to sell a variety of products intended for hunting, fishing, sporting, or outdoor activities (Compl., ¶ 18(d); Pl.Mem. at 26–27); and (5) filing affidavits, declarations, and statements of use with the USPTO that falsely attested to FSLC's use of the Field & Stream mark in connection with certain products (Compl., 18(e)(v); Pl.Mem. at 31–33, 49–50). Times Mirror seeks rescission of the parties' agreements on the basis of defendants' allegedly wrongful conduct.

In light of my determinations regarding the meanings of the agreements, it is clear that most of FSLC's conduct was expressly permitted by those agreements, and therefore the majority of defendants' actions could not constitute a breach of those agreements. The few breaches that did occur were immaterial as a matter of law and therefore cannot provide a basis for the drastic remedy of rescission sought by plaintiff. I address each of the alleged breaches in turn.

As an initial matter, however, the parties disagree as to what conduct is at issue, because of their differing interpretations as to the subject matter of the Settlement Agreement, as discussed above. FSLC contends that the 1995 Agreement resolved all outstanding disputes between the parties up to that point; Times Mirror argues that the 1995 Agreement settled only those disputes relating to products included in the 21 then-pending ITU applications. Under FSLC's interpretation, only those alleged breaches occurring after

the Settlement Agreement are still at issue; any breaches occurring before the 1995 Agreement were either settled by that agreement or waived by the failure to include them. Under Times Mirror's interpretation, any alleged breaches that arose after the 1994 Agreement, except for disputes relating to products included in the 21 ITU applications, are still unresolved. As explained above, I find that FSLC's interpretation comports with the language of the Settlement Agreement. Accordingly, I will examine only those alleged breaches that occurred after the Settlement Agreement.[11]

### a. Tackle Box

Times Mirror alleges that FSLC breached the 1995 Agreement by developing, marketing, and selling a utility box designed to be used as a fishing tackle box, in violation of ¶ 1(h), which required FSLC to amend one of its ITU applications to reflect the exclusion of "boxes designed and sold exclusively as fishing tackle boxes" from FSLC's exclusive right to use the mark on storage boxes. According to plaintiff, FSLC entered breached the 1995 Agreement by entering into three different agreements with Bimini ("Bimini B," "Bimini C," and "Bimini D"; collectively, the "Bimini Agreements") to develop and sell, among other items, different types of utility and storage boxes, including fishing tackle boxes.

■ I disagree. First, as defendants correctly point out, the Settlement Agreement only required FSLC to *amend* its ITU application to exclude storage boxes designed and sold exclusively as fishing tackle boxes; the language of ¶ 1(h) does not prohibit FSLC from *using* the Field & Stream mark in connection with fishing tackle boxes. In other words, ¶ 1(h) only means that FSLC would not receive the exclusive right to use the mark on boxes designed and sold exclusively as fishing tackle boxes through its intent-to-use trademark application; nothing prevented FSLC from obtaining the right to the mark through actual use, under the first use provision.[12] (*See* Def.Mem. at 41–42; Reply Mem. at 23).

Second, defendants correctly observe that FSLC was not prevented from using the Field & Stream mark on fishing tackle boxes because Times Mirror had an exclusive right to use the mark on such a product, for Times Mirror was never awarded such a right. Paragraph 1(h) only required FSLC to exclude "boxes designed and sold as fishing tackle boxes" from its ITU application; it did not grant Times Mirror the right to use the Field & Stream mark on that product. If the parties had intended for Times Mirror to have exclusive use of the mark on fishing tackle boxes, they could have included such an allocation in the Settlement Agreement. Indeed, in other provisions, FSLC and Times Mirror *did* exclude certain products from FSLC's ITU applications and awarded exclusive use of those same products to Times Mirror.

For example, ¶ 1(a) required FSLC to delete "non-chemical fuel additives for two-cycle gasoline engines" from its application and granted the exclusive right to such products to Times Mirror. Similarly, ¶ 1(b) required FSLC to delete "trolling

---

11. Accordingly, I will not analyze Times Mirror's claim that FSLC breached the Joint Licensing Agreement by offering licensed merchandise bearing unapproved Magazine cover art to J.C. Penney (Compl. ¶ 16; Pl.Mem. at 18–19); Times Mirror alleges that this conduct occurred before the Settlement Agreement. Nor will I address plaintiff's claim that FSLC falsely asserted rights to the Field & Stream mark in connection with whiskey and beer (a claim raised for the first time in plaintiff's memorandum of law), which occurred in or around March 1995. (*See* Pl.Mem. at 33–34).

12. The first use provision applies to "all other products covered by the ITU applications" referred to in ¶ 1 of the Settlement Agreement. Boxes designed and sold as fishing tackle boxes clearly fell into this category, as FSLC was being required to amend the application to exclude them.

motors for water[-]going craft" and reserved the right to that product exclusively to Times Mirror. These provisions demonstrate that when FSLC and Times Mirror intended for Times Mirror to have the exclusive right to a product excluded from one of FSLC's ITU applications, they explicitly granted that right to Times Mirror. The absence of any such grant with respect to "boxes designed and sold exclusively as fishing tackle boxes" indicates that the parties did not intend for Times Mirror to have the exclusive right to use the Field & Stream on fishing tackle boxes.

Accordingly, nothing in the 1995 Agreement prevented FSLC from using the mark on "boxes designed and sold exclusively as fishing tackle boxes," and therefore no reasonable jury could find that FSLC breached the 1995 Agreement by using the mark or licensing the mark for use on such products. To the extent that Times Mirror contends that the boxes or certain other products produced under the Bimini Agreements [13] breached any of the other Co–Existence Agreements because the boxes encroached upon Times Mirror's claimed fishing, hunting, or outdoor domains (*see* Pl.Mem. at 29), the argument is rejected, as the Agreements did not create any such domains.

### b. *The NBS Negotiations*

■ Times Mirror contends that FSLC's dealings with NBS were merely "a ploy of Lavin's to attempt to capture a field of use," rather than the "substantial and bona fide negotiations" required by the Settlement Agreement. (Compl., ¶ 18(b); Pl.Mem. at 21–22, 48–49). Times Mirror claims that FSLC's brief and cursory discussions with NBS were merely a sham, for the negotiations did not generate any marketing plans, prototypes, or manufacturing sources for the products FSLC claimed it intended to market, nor did they produce any draft agreements or ultimately, a license agreement.

Times Mirror's arguments are without merit. First, as discussed above, the 1995 Settlement Agreement expressly permits the "capturing" of certain products by the first party to use or license the mark on those products, provided that certain requirements are met.

Second, the Settlement Agreement contains no requirement that negotiations with potential licensees be "substantial and bona fide"; indeed, at the negotiating stage, the agreement imposes virtually no requirements on the negotiating party. Rather, the first use provision of the Settlement Agreement provides that:

> [i]f either party commences negotiations with a third party to license any product under [the first use provision], it shall notify the other party, and for a period not to exceed 90 days thereafter shall have the exclusive right to negotiate such license, and the other party shall take no action to license during such period. If the licensing party fails to consummate a license during the 90 day period, or if negotiations are discontinued prior to the expiration of the 90 day period, it shall so notify the other party . . . .

(Pl.Ex.24, ¶ 3(c)). Under this provision, a party negotiating with a potential licensee need only to commence some sort of negotiations, and to notify the other party to the 1995 Agreement that such negotiations were taking place. If the negotiations ultimately failed, the negotiating party need only inform the other party of such failure. Only if the negotiating party actually entered into a license with the third party would that party have to comply with the

---

13. For example, Times Mirror argues that certain apparel products developed under a fourth Bimini agreement entered into in July 1995 ("Bimini A") violated the Co–Existence Agreements because the apparel products were related to fishing. (Pl.Mem. at 28; Pl. Ex. 40). I note that this argument is inconsistent with plaintiff's contention that apparel items were exclusively allocated to FSLC; apparently what plaintiff is really arguing is that apparel items not related to fishing, hunting, or outdoor activities were allocated to FSLC.

additional requirements of the first use provision.

Here, FSLC entered into negotiations with NBS that apparently were ultimately unsuccessful. Even assuming for purposes of this discussion that these negotiations were not "substantial and bona fide," as Times Mirror contends, as the Settlement Agreement imposed no such requirement, FSLC did not breach the agreement in this regard. Nor did FSLC breach the agreement by failing to generate any marketing plans, prototypes, draft agreements or points of discussion, as plaintiff complains; under the terms of the first use provision, because FSLC and NBS were only at the negotiation stage, FSLC was required only to notify Times Mirror of the commencement and disposition of its negotiations with NBS. FSLC was free to explore the matter of licensing the Field & Stream mark with NBS, even if only to an extent that Times Mirror would consider superficial.

It is not disputed that FSLC notified Times Mirror of the commencement of its negotiations with NBS. (*See* Pl.Ex. 25). Times Mirror states that FSLC failed to inform it that the NBS negotiations had been terminated (*see* Pl.Mem. at 22), but conceded in its response to defendants' interrogatories that none of its breach of contract claims are based on FSLC's failure to give the notification required by the Settlement Agreement. (*See* Def.Ex. 59, No. 107). Moreover, even assuming that FSLC's failure to give the proper notification of the termination of the NBS negotiations constituted a breach of the Settlement Agreement, no reasonable jury could find that such a breach was material.

"Materiality goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably expected.'" *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 421 (S.D.N.Y.1999) ("*ESPN II*") (quoting E. Allen Farnsworth, *Farnsworth on Con-* *tracts* § 8.16 (3d ed.1999)); *see also Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997) ("Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties.") (internal quotations and citations omitted); *Zim Israel Navigation Co. v. Indonesian Exports Dev. Co.,* No. 91 Civ. 3848(CSH), 1993 WL 88223, at *2 (S.D.N.Y. Mar.24, 1993) ("[The question of w]hether a breach is ... material is an alternate formulation of the question of whether a breach 'goes to the essence' of the contract.") (citing 4 Arthur Linton Corbin, *Corbin on Contracts* § 946 n. 5 (1951)). Thus, "[materiality] depends on whether the nonbreaching party lost the benefit of its bargain." *ESPN II,* 76 F.Supp.2d at 421.

Here, no reasonable jury could find that defendants' failure to notify plaintiff of the termination of the NBS negotiations was material. The failure to notify did not go to the essence of the contract between the parties, which was to amicably settle their outstanding disputes over their concurrent uses of the Field & Stream mark and to provide a system for allocating future uses of the mark. At worst, FSLC's failure to notify Times Mirror of the termination of the NBS negotiations could have resulted in a delay of Times Mirror's awareness that it had the right to seek a licensee for the products that had been the subject of the negotiations. Plaintiff does not allege that such a delay even occurred, nor that it would have sought to commence negotiations with another licensee for those products; indeed, Times Mirror implicitly concedes that any breach resulting from the failure to notify was immaterial, for it does not base any of its breach of contract claims on the failure to notify.

Thus, a reasonable jury could only find that FSLC's failure to notify Times Mirror of the termination of the NBS negotiations was an immaterial breach of the Settlement Agreement. Plaintiff's claims based on the NBS negotiations are therefore dismissed.

#### c. *License Agreements with Third Parties*

Times Mirror claims that FSLC's license agreements with six different companies were illusory and entered into solely to "capture" exclusive rights to use the Field & Stream mark in connection with various products, for these licensees "never intended to use, develop, manufacture and sell . . . any product bearing the Field & Stream mark." (Compl., ¶ 18(c); *see* Pl.Mem. at 24–26). Plaintiff contends that certain characteristics of the license agreements and negotiations indicate the illusory nature of the agreements, specifically pointing to FSLC's failure to meet certain criteria allegedly imposed by the Settlement Agreement as evidence of the sham nature of the five [14] third-party license agreements. Times Mirror's arguments fail, however, because as defendants correctly note, the Settlement Agreement did not impose the requirements that Times Mirror claims it did, and accordingly, the failure to meet those requirements cannot be a breach of that agreement.

Times Mirror contends that the illusory nature of FSLC's license agreements with Bimini, Folsom, Casual Lifestyles, Adventurous Products,[15] Sporting Mind, and Waldoch is demonstrated by the following shortcomings: (1) all of the license agreements were drafted by defendants; (2) none of the license agreements contained minimum advertising, license fee, or net worth requirements; (3) the agreements were preceded by cursory negotiations and discussions about the licensees' financial stability and production and sales capacity; (4) the licensees did not advertise or otherwise market the products produced under the agreements; and (5) few, if any, products were actually manufactured and sold.

Even assuming, for purposes of this motion, that plaintiffs have properly charac-terized the nature of the dealings between FSLC and its six licensees, FSLC's failure to meet the standards articulated by Times Mirror would not amount to a breach of the Settlement Agreement, for that agreement did not contain any such requirements. Rather, in addition to the negotiations-stage criteria set forth in the previous section, the Settlement Agreement required the party executing a license agreement with a licensee to meet certain limited requirements; the licensing party had only to provide the other party to the Settlement Agreement with a copy of the license agreement and to certify to the other party that the licensee (i) was not an affiliate; (ii) had an operating business; and (iii) was in the product business for the goods to be licensed or had the qualifications to be in such business. (*See* Pl.Ex. 24, ¶ 3(c)(i)). Times Mirror does not allege that FSLC failed to provide any of the required notifications or certifications with respect to the five license agreements in question, and FSLC contends that it fulfilled the required criteria. (*See* Def.Mem. at 37 & n. 32).

Once again, Times Mirror's contentions rest on its mischaracterization of an agreement between the parties. No reasonable jury could find that defendants breached the Settlement Agreement by failing to fulfill the phantom "requirements" propounded by plaintiff. Accordingly, plaintiff's breach claims with respect to the agreements between FSLC and Bimini, Folsom, Casual Lifestyles, Adventurous Products, Waldoch, and Sporting Mind, as set forth in ¶ 18(c) of the Complaint, must be dismissed.

#### d. *FSLC's Alleged "Encroachment" on Times Mirror's Domains*

Plaintiff alleges that FSLC breached by developing, manufacturing, offering for

---

**14.** Although FSLC entered into agreements with six licensees, there were only five agreements; one of the agreements was among FSLC, Bimini, and Folsom. (*See* Pl.Ex. 35).

**15.** I note that neither the Complaint nor plaintiff's interrogatory answers (*see* Def.Ex. 2, No. 122) mention the Adventurous Products agreement; Times Mirror voices its objections to this license for the first time in its memorandum of law.

sale, and selling products bearing the Field & Stream mark and intended for use in hunting, fishing, sporting and other outdoor activities. (Compl., ¶ 18(d)). Specifically, in addition to the products listed in the Complaint, plaintiff contends that the products manufactured and sold pursuant to FSLC's licenses with Triad, Suntime, and Bimini—which included hunting clothing, game bags, rainwear, fishing vests, and watches—encroached on Times Mirror's claimed hunting, fishing, and outdoor "domains." [16] (Pl.Mem. at 26–27, 28).

Given my holding that neither the Co-Existence Agreements nor the Settlement Agreement granted Times Mirror the exclusive right to use the mark in connection with the broad category of products relating to hunting, fishing, and outdoor activities, as it contends, it is clear that no reasonable jury could conclude that defendants materially breached that agreement by developing, manufacturing, or selling any of the products about which Times Mirror complains. Moreover, with respect to the Suntime license for watches, under the terms of the Settlement Agreement, FSLC had the exclusive right to use the mark on watches. (*See* Pl.Ex. 24, ¶ 1(f)).

### e. *USPTO Submissions*

██ Plaintiff alleges that FSLC and Lavin breached "one or more" of the agreements between the parties by filing numerous false affidavits and declarations with the USPTO to capture fields of use pursuant to the first use provision. (*See* Compl., ¶ 18(e)(v); Pl.Mem. at 31–33, 49–50). Defendants summarily deny plaintiff's allegations, contending that even if Lavin had submitted false statements to the USPTO, such conduct would not violate any of the parties' agreements. (Def.Mem. at 48).

Although Times Mirror does not identify which specific contractual provision defendants' conduct, if proved, would breach—or even specify which *agreement* would be breached—I assume, for purposes of this discussion, that the filing of false statements with the USPTO would breach ¶ 4(b) of the Settlement Agreement. That paragraph provides that "neither party will file any future applications to register (the Field & Stream mark) except based on actual use of licensing of the Trademark for such product." If a party filed statements with the USPTO attesting to actual use of the Field & Stream mark on a product when in fact that party had *not* actually used the mark on the product, a reasonable jury could find that the party who had filed the false statements had breached ¶ 4(b) of the Settlement Agreement. With respect to two of the three USPTO filings in issue,[17] Times Mirror has failed to adduce sufficient evidence to support a jury verdict in its favor, and the remaining filing, while seemingly false, is an immaterial breach.

First, plaintiff claims that Lavin filed a "Statement of Use" with the USPTO dated July 2, 1996, in which he declared under oath that he had been using the Field & Stream mark in commerce on comforters "*since* June 1994," when in fact the mark had not been used on comforters since late 1995. (*See* Pl.Mem. at 33; Pl.Ex. 10) (emphasis added). Times Mirror mischaracterizes the nature of Lavin's representation in the USPTO filing. The Statement of Use asked for the date of the *first* use of the mark, and Lavin responded by entering "June 13, 1994." (*See* Pl.Ex. 10). Lavin did not attest to *continuous* use of the

---

**16.** Again, I do not address any alleged breaches that occurred before the June 1995 Settlement Agreement. (*See supra* at 729–30). The Triad, Suntime, and Bimini agreements at issue here were executed after the Settlement Agreement. FSLC entered into agreements with Bimini in July 1995 (Bimini A), with Suntime in January 1996, and with Triad

in November 1995 and August 1996. (*See* Pl.Ex. 40, 27, & 51).

**17.** Only three of the USPTO filings about which plaintiff complains were filed after June 6, 1995, the date of the Settlement Agreement. (*See* Compl., ¶ 18(f); Pl.Mem. at 31–33).

mark "since June 1994," as plaintiff contends, and thus the fact that comforters bearing the mark had last been sold in 1995, even if proved, would not render the Statement of Use false.

Second, Times Mirror asserts that an August 29, 1996 Statement of Use filed by Lavin with the USPTO stating that FSLC was using the Field & Stream mark on couches, sofas, chairs, tables, cushions, camping tables, and cots was false because FSLC did not use the mark on cots or camping tables. (*See* Pl.Mem. at 33; Pl. Ex. 12). Plaintiff provides no evidentiary support for this contention. Times Mirror cites to the deposition testimony of Chet Stoler, President of Casual Lifestyles, but the deposition excerpts submitted to the Court do not support Times Mirror's argument. Stoler is the president of one of FSLC's licensees; his testimony is at best only proof that *his* company did not use the Field & Stream mark on certain products it made. Although Casual Lifestyles may not have used the mark on the products listed in the Statement of Use, FSLC could have made use of the mark on those products through another one of its hundreds of licensees, or by using the mark itself. Moreover, in the excerpts cited by plaintiff, Stoler does not testify that he used the Field & Stream mark on couches, sofas, chairs, tables, and cushions but not on cots or camping tables, as Times Mirror claims; in fact, Stoler states that he only used the mark on pillows and futon covers. (*See* Pl.Ex. 14 at 28).

Finally, Times Mirror complains that in an October 10, 1995 declaration submitted to the USPTO, Lavin falsely attested, under oath, that FSLC had continuously used the Field & Stream mark for five consecutive years since 1989 in connection with retail clothing store services (*see* Pl. Ex. 9), when, in fact, FSLC did not use the mark in connection with retail stores from 1991 through 1994. (*See* Pl.Mem. at 33). In his deposition testimony, Lavin admitted that FSLC did not use the mark continuously for the five consecutive years

from 1989; he stated that from 1991 until 1995, FSLC did not use the mark in connection with any retail store services. (*See* Pl.Ex. 15 at 712, 718). Based on Lavin's testimony, a reasonable jury could find that defendants had breached ¶ 4(b) of the Settlement Agreement.

Even if a jury were to find that defendants had breached the Settlement Agreement, however, such a breach is immaterial as a matter of law, for the breach would not have deprived Times Mirror of the benefit of that agreement. The Settlement Agreement set up a system to allocate future uses of the Field & Stream mark; under the terms of the first use provision, the first party to use or license the mark on a product could "capture" that product and later file a trademark application based on its actual use. Under the first use provision, the length or continuity of a party's use of the mark on a product is irrelevant; what matters is that the party is the first to actually use the mark on a particular product.

Here, even assuming that Lavin falsely attested to continuous use of the mark for retail store services, this false statement would not have affected FSLC's ability to capture the mark for such services under the first use provision, for FSLC would still have been the first party to actually use the mark in connection with this product. Lavin testified that FSLC had used the mark on several stores in 1990 and 1991, and then used the mark again, on several retail stores in 1995, 1996 and 1997. (Pl.Ex. 15 at 712). The fact that FSLC had not used the mark in connection with retail stores continuously since 1989, if proven, would not have affected the rights of FSLC or Times Mirror under the first use provision. Accordingly, Times Mirror cannot establish that the breach, even if proved at trial, goes to the essence of the agreement or deprives it of the benefit of its bargain.

\* \* \* \* \* \*

In sum, Times Mirror has identified two breaches of the parties' various agree-

ments, both of which were immaterial as a matter of law. The remaining alleged breaches were not breaches at all, for the conduct complained of is explicitly permitted by the language of the agreements.

### 3. Rescission

Times Mirror argues that FSLC's allegedly wrongful conduct warrants rescission[18] of all of the parties' agreements, under two theories: (1) defendants' breaches of the express terms of the contracts; and (2) defendants' breach of the covenant of good faith and fair dealing implicit in every contract. (*See* Pl.Mem. at 51). Plaintiff's rescission argument fails under either theory.

■ First, it is well-settled under New York law that an immaterial breach cannot be a basis for rescission. As the Second Circuit has put it, "before rescission will be permitted the breach must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'" *Septembertide Publ'g, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989) (quoting *Callanan v. Powers*, 199 N.Y. 268, 284, 92 N.E. 747 (1910)). "As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties." *Id.; accord Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980); *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1186 (2d Cir.1975); *Lurzer GMBH v. American Showcase, Inc.*, 75 F.Supp.2d 98, 100 (S.D.N.Y.1998), *aff'd* 201 F.3d 431 (2d Cir.1999); *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F.Supp.2d 355, 362 (S.D.N.Y. 1998). As discussed above, defendants' isolated breaches were immaterial, and therefore the "extraordinary remedy" of rescission is not warranted. *See ESPN v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 392 (S.D.N.Y.1999) (*"ESPN I"*) ("The remedy of termination—or, more accurately, the 'right' to terminate—is available only where one party has materially breached the contract."); *Cafferty v. Scotti Bros. Records*, 969 F.Supp. 193, 205 (S.D.N.Y.1997).

Second, while under New York law "[i]n every contract there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement," *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980), Times Mirror was not deprived of any of the benefits of any of the agreements between itself and FSLC. In fact, Times Mirror has received the benefits of the contracts between the parties, including royalty revenues from products licensed by FSLC, exclusive rights to certain products, limitations on FSLC's rights to certain products, and the withdrawal of several of FSLC's trademark applications.

■ In addition, as discussed in detail above, with only two immaterial exceptions, defendants' conduct was not wrongful and did not constitute a breach of any of the parties' agreements. While a party may breach the implied duty of good faith and fair dealing even if it has not breached the express terms of the contract, a party breaches this implied duty only when it does something that "destroy[s] or injure[s] the right of another party to receive the benefits of the contract." *Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y. 1994); *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 305 (S.D.N.Y.1998) (implied duty of good faith and fair dealing prohibits either party from acting in a manner "which will have the effect of destroying or injuring the

---

**18.** Although plaintiff seeks termination of the parties' agreements rather than rescission in its complaint (*see* Compl. at 17, ¶ 5), for purposes of this discussion, termination is equivalent to rescission. *See generally Dun &* Bradstreet Corp. v. Harpercollins Publishers, Inc., 872 F.Supp. 103, 110 (S.D.N.Y.1995). Moreover, in its brief, plaintiff asks the Court to order rescission of the parties' agreements. (*See* Pl.Mem. at 52).

right of the other party to receive the fruits of the contract") (internal quotations and citation omitted). FSLC has not done anything to destroy Times Mirror's right to receive the benefits of any of the parties' contracts.

Moreover, "[t]he covenant encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Granite Partners,* 17 F.Supp.2d at 305 (quoting *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 389, 663 N.E.2d 289, 292, 639 N.Y.S.2d 977, 979 (1995) (citations and internal quotations omitted)). Plaintiff's contention that it has been deprived of the benefits of the parties' agreements rests in part on its interpretation of those contracts—that it was entitled to sweeping "domains of use"—when that interpretation is simply incorrect and unreasonable.

 Furthermore, Times Mirror waived any right to seek termination of the agreements by electing to continue to do business with FSLC after the alleged breaches. Under the doctrine of election of remedies, when a party materially breaches a contract, the non-breaching party may choose to continue to perform the contract or it may refuse to continue and terminate the agreement. *See Lazard Freres & Co. v. Crown Sterling Management, Inc.,* 901 F.Supp. 133, 136 (S.D.N.Y. 1995); *ESPN I,* 76 F.Supp.2d at 387. If the non-breaching party chooses the first option, "it may not later renounce its election to continue and seek to terminate on the prior breach." *Lazard Freres,* 901 F.Supp. at 136; *see also ESPN I,* 76 F.Supp.2d at 387 ("Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach...."); *AM Cosmetics Inc. v. Solomon,* 67 F.Supp.2d 312, 317 (S.D.N.Y.1999); *Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F.Supp. 658, 668 (S.D.N.Y.1996), *aff'd mem.,* 122 F.3d 1055 (2d Cir.1997).

Here, even if plaintiff's allegations of material breach are assumed to be true,

Times Mirror elected to continue the parties' agreements and thus cannot now seek to terminate those contracts. With respect to the alleged breaches that occurred before the Settlement Agreement, Times Mirror waived its right to seek termination based on those breaches by continuing to enter into agreements with FSLC. *See Alesayi,* 947 F.Supp. at 669 ("By entering into the November, 1984 agreement with Alesayi, Canada Dry forgave any breach by Alesayi that might have occurred prior to the date of that agreement.") (citation omitted). Plaintiff has also waived any right to terminate based on any of the alleged breaches that occurred after the June 1995 Settlement Agreement, for it continued to perform the contract by accepting performance by FSLC. *See ESPN I,* 76 F.Supp.2d at 387 (A non-breaching party "can indicate that [it] has chosen to continue the contract ... by accepting the performance of the breaching party."). As recently as 1998, Times Mirror received from FSLC its share of joint licensing royalties, pursuant to the various joint licensing provisions in the parties' agreements. (*See* Def.Ex. 67). By electing to continue the contracts between the parties, plaintiff has waived any right to terminate the contracts.

 Times Mirror asserts that it has not waived its right to sue for termination even though it continued to perform the contracts because there were "frequent communications and negotiations regarding [FSLC]'s permissible uses" of the Field & Stream mark under the parties' agreements. (Pl.Mem. at 52 n. 28). Plaintiff is confusing its remedies, however. A non-breaching party who elects to continue to perform a contract may still sue later and recover damages solely for the *breach* of the agreement, provided that it gives notice of the breach to the breaching party. *See, e.g., ESPN I,* 76 F.Supp.2d at 387 ("When a party materially breaches a contract, the non-breaching party ... can continue the contract and recover damages solely for the breach."); *Alesayi,* 947

F.Supp. at 668 ("[T]he non-breaching party may later sue for breach, even though it elected to continue to perform rather than terminate the agreement, if notice of the breach was given to the breaching party."). As explained above, however, the non-breaching party who chooses to continue to perform the contract can never thereafter renounce its election to continue and seek to *terminate* the contract based on the prior breach. *ESPN I*, 76 F.Supp.2d at 387; *Lazard Freres*, 901 F.Supp. at 136.

Therefore, even assuming for purposes of this discussion that any breaches were material and that the "frequent communications and negotiations regarding [FSLC's] permissible uses" of the mark between the parties constituted Times Mirror's notice of the breaches, plaintiff cannot seek rescission of the agreements, but is limited to seeking damages resulting from the breach.

Ultimately, Times Mirror seems now to regret the bargains it struck, because defendants took advantage of the rights and opportunities provided by the parties' agreements to build a thriving business. This Court will not "reallocate rights bargained for by sophisticated entities in an arms-length transaction" simply because Times Mirror now wishes that it had struck a better deal for itself. *Chase*, 873 F.Supp. at 813; *see also Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 487 (2d Cir.1998) ("[T]he party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation.").

Because no genuine issue of material fact exists with respect to Times Mirror's breach of contract claims, defendants' motion for summary judgment is granted with respect to these claims.

## B. *Trademark Infringement, False Designation of Origin, and Unfair Competition Claims*

■■■ Times Mirror contends that rescission of the agreements is warranted even if the Court finds that FSLC did not breach any of the parties' contracts. According to plaintiff, if defendants' interpretation of the contract is correct, the concurrent use of the Field & Stream mark permitted by the parties' contracts undermines the Lanham Act's primary purpose of protecting the public from confusion as to the source of a product or service, and therefore the agreements must be rescinded on public policy grounds. Times Mirror asserts that there have been numerous instances of actual consumer confusion over the source of FSLC's products as a result of defendants' conduct, and that there is a likelihood of future consumer confusion if defendants are not permanently enjoined from selling or licensing products bearing the Field & Stream mark.

Defendants argue that the parties' rights with respect to the Field & Stream mark are governed by the terms of the Settlement Agreement, and that absent significant injury to the consuming public, Times Mirror should be held to the terms of its contracts, which, as detailed in the previous section, permit FSLC to conduct the use and licensing activity of which plaintiff complains. Defendants also point out that the Settlement Agreement contains a provision prohibiting either Times Mirror or FSLC from taking any legal action against the other party that would interfere with that party's use of the mark on a product exclusively reserved to them under the provisions of the Settlement Agreement.[19]

---

19. "If a party hereto has a product specified in ... this Agreement to be reserved exclusively to that party (the 'Use Party'), the other party ('Other Party') ... shall not at any time file any opposition or cancellation with the [USPTO], commence any civil proceeding for damages or injunctive relief, or make any other legal claim that directly or indirectly would hinder the Use Party's use of the Trademark for a product reserved exclusively to the Use Party or prevent the [USPTO] from issuing a trademark registration to the Use

Defendants are correct. In the absence of significant injury to the consuming public, a party entering into a settlement agreement with respect to a trademark will be held to its contract. Here, Times Mirror has not demonstrated that any public confusion that may result from the parties' shared use of the Field & Stream mark rises to the level of injury to the public. Moreover, the public interest in enforcing contracts outweighs any harm the public might experience due to possible confusion between the parties' products, particularly when, as here, Times Mirror repeatedly entered into agreements with FSLC with full knowledge of the potential for public confusion between its products and those of FSLC, and FSLC relied on the contractual promises made by Times Mirror. Finally, the judicial policy of encouraging out-of-court settlement of trademark disputes is best served by holding the parties to their contractual undertakings. For all of these reasons, as discussed more thoroughly below, defendants' motion is granted, and plaintiff's trademark infringement, false designation of origin, and unfair competition claims, brought under the Lanham Act and New York common law, are dismissed.

### 1. *Legal Standards*

One of the primary purposes of the Lanham Act is to protect the public from confusion as to the source of goods. *See, e.g., Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 740 (2d Cir.1994). The ultimate inquiry in the typical trademark infringement, unfair competition, and false designation of origin suits brought under the Lanham Act "is whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.' " *Thompson Medical Co. v. Pfizer,* 753 F.2d 208, 213 (2d Cir.1985) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d

44, 47 (2d Cir.1978)); *see also Nabisco, Inc. v. Warner–Lambert Co.,* No. 99–7191, —— F.3d ——, ——, 2000 WL 790926, at *2 (2d Cir. June 5, 2000) ("To prevail on its trademark infringement and unfair competition claims, Nabisco must prove that ICE BREAKERS is a protectable trademark and that Warner–Lambert's use of DENTYNE ICE is likely to confuse consumers as to the source or sponsorship of Nabisco's ICE BREAKERS product."); *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000) (in false designation of origin case, "[t]he hallmark of infringement ... is likelihood of confusion"). The standard for unfair competition claims brought under New York common law is virtually identical. *See Girl Scouts v. Bantam Doubleday Dell Publ'g Group, Inc.,* 808 F.Supp. 1112, 1131 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1477 (2d Cir.1993).

When the parties involved in a trademark dispute have entered into an agreement governing their rights to use the mark, however, the party seeking rescission of the contract must show more than mere likelihood of confusion. "[A] party entering into [an agreement] with respect to a trademark will be held to his contract unless enforcement of the contract would result in *injury* to the public through confusion." *VISA Int'l Serv. Ass'n v. Bankcard Holders of America,* 784 F.2d 1472, 1473 (9th Cir.1986) (emphasis added); *accord Proriver, Inc. v. Red River Grill, LLC,* 83 F.Supp.2d 42, 45 (D.D.C.1999); *Kegan v. Apple Computer, Inc.,* No. 95 C 1339, 1996 WL 667808, at *3 (N.D.Ill. Nov.15, 1996); *see also Peyrat v. L.N. Renault & Sons, Inc.,* 247 F.Supp. 1009, 1014 (S.D.N.Y.1965) (an agreement between parties to a trademark controversy "is valid and enforceable so long as no injury is caused to the public"). If the party seeking rescission of a trademark agreement demonstrates that enforcement

Party based upon an application for the Trademark for such products or from renewing any such trademark registration obtained

by the Use Party for the Trademark." (Pl. Ex.24, ¶ 2(c)).

of the contract will create confusion that will cause harm to the public, "the court must then weigh this confusion and resulting harm against contract law's policy of holding parties to the terms of their agreements, in order to determine whether enforcement of the contract ultimately violates public policy." *Proriver,* 83 F.Supp.2d at 45–46; *see also VISA Int'l,* 784 F.2d at 1474–75; *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 328 (6th Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973); *T & T Mfg. Co. v. A.T. Cross Co.,* 449 F.Supp. 813, 827 (D.R.I.) ("*T & T I* "), *aff'd* 587 F.2d 533 (1st Cir.1978) ("*T & T II* "), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979).

The question of whether enforcement of the trademark agreement will cause confusion is a separate inquiry from the question of whether it will cause injury. In other words, a finding of public confusion does not necessarily result in a finding of public injury. As the First Circuit explained:

We cannot agree with [the party seeking rescission] that merely because the district court made a finding of likelihood of public confusion that [i]pso facto the Settlement Agreement should now not be enforced according to its terms. Rather, ... the *[d]egree or [e]xtent of public confusion must be examined in order to ascertain whether there is any significant harm to the public* by decreeing enforcement of the Settlement Agreement. Additionally, there are other considerations, most notably the policy, vital to the law of contracts, of holding people to the terms of agreements knowingly and willfully entered into.

*T & T II,* 587 F.2d at 538 (emphasis added); *accord VISA Int'l,* 784 F.2d at 1474 n. 2; *Proriver,* 83 F.Supp.2d at 46 n. 5. *But see Peyrat,* 247 F.Supp. at 1014 (stating that "[c]onfusion as to the source of origin of a consumer product would be the type of public injury which must be prevented").

With these principles in mind, I turn to plaintiff's arguments.

### 2. *Application*

No reasonable finder of fact could find that enforcement of the parties' contracts would create a level of confusion that would cause harm to the consuming public. A reasonable finder of fact could find that a *likelihood* of confusion exists; plaintiff points out that the Magazine has received numerous communications from consumers inquiring as to where they can purchase an FSLC product (and occasionally complaining about an FSLC product). Indeed, defendants concede that confusion over the parties' shared use of the Field & Stream mark pursuant to the Settlement Agreement may occasionally lead a person wishing to purchase (or to complain about) an FSLC product to contact Times Mirror in the mistaken belief that Times Mirror is the source of the product. (*See* Reply Mem. at 47). Nevertheless, as explained above, public confusion does not necessarily equal public injury, and in this case, a reasonable finder of fact could only find that the degree and extent of possible harm to the consuming public is minimal.

At worst, a consumer who contacts Times Mirror seeking to buy an FSLC product may be momentarily inconvenienced or annoyed when he or she learns that Times Mirror does not sell that particular product. His or her confusion can be easily dispelled by Times Mirror, however, and, at most, upon learning that FSLC is actually the source of the product, the consumer will be forced to either make another phone call or write another letter to FSLC to inquire about the product, or deciding not to purchase the product. If Times Mirror does not identify FSLC as the source, the consumer may need to investigate further on his or her own to find out what company makes the product. None of these outcomes constitute a significant injury to the consuming public. *See Proriver,* 83 F.Supp.2d at 46–47. (confusion between restaurants "Red

River Grill" and "Red River Authentic Barbeque & Grille" cannot be deemed a significant injury to the public, for "[a]t most, [a] patron [who shows up at the wrong restaurant] will be forced to either correct his mistake by traveling to the desired restaurant, settle by patronizing the non-desired restaurant, or patronize neither restaurant"); *see also T & T I*, 449 F.Supp. at 827 (no significant harm to public caused by confusion between pens, "even though a consumer might claim harm because he sought the prestige of Cross but got Quill instead").

By contrast, those cases in which courts have found a significant public injury involved a far greater level of harm. *See, e.g., VISA Int'l*, 784 F.2d at 1474 nn. 1 & 2 (noting that potential injury from public confusion between two credit card insurers would not "necessarily be insignificant" because confusion could lead consumers to choose the wrong insurer; "purchasers of insurance . . . may well base their decisions on the reputation and financial strength of the supplier"); *Kegan*, 1996 WL 667808, at *3 (finding that enforcement of contract could result in an "improper appropriation" of a generic term, which "could harm the public in that other businesses would be estopped from using that word to describe their products").

Balancing the risk of confusion and minimal harm that could result from the parties' shared use of the Field & Stream mark against the public interest in "enforcing contracts and protecting the reliance they induce," *T & T I*, 449 F.Supp. at 827, I conclude as a matter of law that the level of injury does not outweigh the public interest in holding parties to their commitments, for several reasons.

First, Times Mirror voluntarily and repeatedly entered into contracts with FSLC that allowed for the possibility of confusion. Between 1984 and 1995, plaintiff or its predecessor entered into *five* agreements with FSLC or its predecessor. After the 1984 Agreement, Times Mirror entered into four more contracts with FSLC,

knowing that FSLC intended to expand its licensing activities to encompass products other than apparel that could relate to the hunting, fishing, and other outdoor activities featured by plaintiff in the Magazine; in 1989 and 1993, FSLC had filed ITU trademark applications with the USPTO listing various non-apparel products for which it hoped to obtain trademark registrations, and some of those products were clearly related to the sporting areas covered by the Magazine. Times Mirror entered into the 1991, 1994, Joint Licensing, and Settlement Agreements "with full knowledge of a potential for immediate public confusion between its products and those of [defendants]," and then, some twelve years later, sought to rescind the agreements on the basis of the public confusion that "it was instrumental in bringing about in the first place." *T & T II*, 587 F.2d at 539. As the First Circuit observed in *T & T II*, "[i]t appears at best incongruous that a party should be permitted to disaffirm a contract as against public policy when such grounds are the very grounds that the party itself knowingly and wilfully helped to create." *Id.; see also T & T I*, 449 F.Supp. at 827 (in considering whether or not to enforce a contract, a court "should be careful not to afford a business more protection for its interests than it sought through contract").

Second, the parties and their predecessors have been jointly using the mark for nearly one hundred years. The concurrent use of the mark for such a long period of time strongly undercuts any claim of significant public injury from continued concurrent use.

Third, there is a strong public interest in protecting the reliance that contracts induce. *T & T I*, 449 F.Supp. at 827. Times Mirror expressly warranted in the Settlement Agreement that it would not "commence any civil proceeding for damages or injunctive relief, or make any other legal claim that directly or indirectly would hinder [FSLC's] use of the Trademark for a product reserved exclusively to [FSLC]."

(Pl.Ex.24, ¶ 2(c)). FSLC complied with the terms of the Settlement Agreement in expanding its licensing activities in the years following that agreement, and absent any material breach, FSLC is entitled to rely on Times Mirror's promise not to bring a legal proceeding based on FSLC's proper use of the Field & Stream mark. *See Proriver*, 83 F.Supp.2d at 47. Moreover, after numerous arms-length negotiations, the parties spelled out in great detail what their rights and obligations would be, and the interests of justice would not be served if this Court were to tear up those agreements now.

Finally, the strong public interest in "the judicial policy of encouraging extrajudicial settlement of trademark litigation" also weighs in favor of enforcing the parties' agreements. *T & T II*, 587 F.2d at 533. As the district court stated in *T & T I*:

> Insisting that a court review a settlement to assure that no public confusion will result would make such agreements of little value to the parties. Parties would sensibly conclude that they might better litigate the issue of confusion to conclusion rather than reach a settlement which might later be found to be unenforceable.

*T & T I*, 449 F.Supp. at 827; *see also MWS Wire Indus., Inc. v. California Fine Wire Co.*, 797 F.2d 799, 803 (9th Cir.1986). Moreover, judicial review of trademark settlement agreements would undermine the policy of giving deference to the contractual agreements of business people who are in a better position than the court "to determine whether their self-interest is better served by making such contracts or not." *Id.*

The parties' contracts will be enforced as written. Those contracts not only allow FSLC to use the Field & Stream mark on products to which it has gained the exclu-

sive right, but also prohibit Times Mirror from commencing "any civil proceeding for damages or injunctive relief," or making "any other legal claim that directly or indirectly would hinder [FSLC's] use of the Trademark for a product reserved exclusively to [it]." (Pl.Ex.24, ¶ 2(c)). Accordingly, plaintiff's trademark infringement, false designation of origin, and unfair competition claims are dismissed.[20]

## CONCLUSION

Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment dismissing the complaint with prejudice and with costs.

SO ORDERED.

---

20. As discussed in the breach of contract section, plaintiff's breach of contract claims regarding the display of the Magazine on an FSLC table at a trade show and the use of

certain slogans (*see* Compl., ¶ 18(e)(i)–(iii)) were, in essence, unfair competition claims. (*See supra* n. 7). These claims, too, are dismissed.